## DOLLOWAY v. TURRILL.

In an action for a *libel*, where, in the article complained of as libellous, after stating that A. B., a judicial officer, had affixed a *jurat* to a paper purporting to be an affidavit which was used to prevent the re-appointment of a certain individual to office, when in fact no oath was administered to the deponent, and that A. B. had been busy in concerting measures to prevent such re-appointment—an appeal was made to the public whether, under the circumstances, A. B. had not committed a gross violation of his official oath for the purpose of ruining the incumbent of the office: IT WAS HELD that a charge to a jury, as *matter of law*, that the *publication was libellous and not susceptible of an innocent construction*, was erroneous; and that, instead thereof, the question, *in what sense the words were used?* should have been submitted to the *jury*; and a new trial was accordingly granted.

In this case there was attached to the plea of *not guilty* a *notice* of special matter to be given in evidence on the trial, setting forth certain conduct of the plaintiff below, in his official character as a judicial officer, but not alleging that in the conduct imputed to him he had acted *corruptly*: whether the court for the correction of errors held the evidence admissible under the *notice* or under the *general issue*—QUERE, as no resolution was adopted explaining the particular ground upon which a majority of the court acted in granting the new trial.*

ERROR from the Supreme Court. Turrill brought an action against Dolloway for the publication of an alleged libel. The publication was in these words: "To

---

* *Senator* ROOT, in the opinion delivered by him, holds that the provision in the constitution of this state, in these words: "In all prosecutions or indictments for libels the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact," (*Const.; Art.* 7, § 8,) applies as well to *civil suits* as to *criminal prosecutions* for libels. In this opinion *Senator* VERPLANCK concurred. The CHANCELLOR, on the contrary, held that the provision in the constitution applies *only* to *criminal prosecutions* for libels, and that the extension of it to *civil suits*, instead of operating to the protection of individuals charged with the publication of alleged libellous matter, as was intended by the framers of the constitution, would have the effect to hold parties responsible in cases where at the common law they would be entitled to a verdict. At the common law, a defendant is entitled to a verdict where he proves the matter alleged in the publication to be true; but if the provision of the constitution be deemed to extend to a *civil suit*, he will be obliged, besides shewing the *truth* of his allegations, to satisfy the jury that the matter charged as libellous was published *with good motives* and *for justifiable ends*.

THE PUBLIC. We, the undersigned, inhabitants of the village of Oswego, take upon ourselves the responsibility of informing the public that Joel Turrill, now a candidate for the office of member of congress, did, about the 1st of March, 1830, put his official signature as first judge of the county of Oswego, to a statement in writing, in the form of an affidavit, and stated under his hand that the person who signed it was *duly sworn*, when in truth the said person was *not sworn* at all; and we further say, that the said paper purporting to be an affidavit, was intended, and used, for the purpose of preventing the re-appointment of the present collector of the customs for the port of Oswego; and that the said Joel Turrill did, about that time, make himself, secretly, as he supposed, busy in concerting measures to produce that result. We leave the public to judge under the circumstances, whether Judge Turrill has not committed a gross violation of his oath of office, for the purpose of ruining a man whom he has long endeavored to injure, although he belongs to the same political party with himself." The publication was signed with the proper names of the defendant and four other persons, and was published in a newspaper on 25th October, 1832. The plaintiff, in his declaration, stated that at the time when it was alleged that the affidavit referred to in the publication was made, he was first judge of the county courts of the county of Oswego, and that the defendant intending to cause it to be believed *that he, in his office of first judge, had conducted himself in a corrupt and criminal manner*, and was destitute of official purity and judicial integrity, caused the publication to be made, which he alleged to be false, scandalous and defamatory.

The defendant pleaded the general issue, and accompanied the plea with a notice that on the trial of the cause he would prove, that on the 1st day of March, 1830, the plaintiff affixed his official signature, as first judge of the county courts of Oswego, to a statement in writing, purporting to be an affidavit, made by one Matthew McNair,

certifying that McNair had been duly sworn to the truth
of the facts set forth in such statement, when in fact he had
not been sworn; that the statement was intended and used
for the purpose of preventing the re-appointment of John
Grant, jun., then being collector of the customs of the port
of Oswego; that the plaintiff, at the time when he so af-
fixed his signature, and before and since, made himself se-
cretly busy in concerting measures to prevent the re-ap-
pointment of Grant, and had for a long time previous to
the publication complained of, endeavored to injure Grant,
although he belonged to the same political party with him-
self; and that at the time of the publication, the plaintiff
was a candidate for the office of a representative in the
congress of the United States, and that the publication was
made with good motives and for justifiable ends, to wit: to
inform the electors of the congressional district of the facts
detailed therein; and that all the matters alleged in the
declaration to be libellous were true.

On these pleadings the cause was tried a second time at
the Oswego circuit, in December, 1838, before the Hon.
PHILO GRIDLEY, one of the circuit judges, in pursuance of
an order for a *new trial.   See* 17 *Wendell* 426, *et sequitur.*
It was shewn that the plaintiff held the office of first judge,
was a candidate for congress, and was duly elected at the
fall election in 1832.   The publication of the alleged libel
in the newspaper specified in the declaration, on the 25th
October, 1832, was proved, and it was also shewn that the
same article appeared in another newspaper: which latter
evidence was objected to, but received, and an exception
taken.   The defendant was proved to be worth $30,000,
and the plaintiff rested.   The defendant then offered to
prove the several facts and circumstances specified in the
notice subjoined to his plea: to which proof the plaintiff
objected " on the ground of the insufficiency of said notice;
and also as to the charge respecting the affidavit, that the
facts stated in the notice did not amount to a justification
of the charge:" which objection was sustained by the cir-

VOL. XXVI.                    49

1841.

Dolloway
*v.*
Turrill.

1841.

Dolloway
v.
Turrill.

cuit judge and the evidence rejected. The defendant also offered to prove that the plaintiff did the several acts specified in the publication corruptly, and with the intent and motive alleged in the declaration to be charged against him: which evidence was also objected to and rejected. The counsel for the defendant then requested the judge to charge the jury, that they had a right to decide in what sense the words contained in the publication were used: that is, whether they imported a charge of *inadvertence* on the part of the plaintiff, in certifying that he swore the person to the truth of the affidavit, when in fact he had not administered any oath, or whether they imported *official corruption* in the plaintiff; and if they should find that they were used in an innocent sense, then they were not actionable. The judge declined so to charge: and on the contrary, told the jury that any written or printed publication was actionable which charged an individual with a want of integrity, or with corruption in office; that the article in question charged the plaintiff with an act, which not only would imply a want of integrity, but amount to an unequivocal charge of official corruption, and which, if true, would have rendered him unworthy of the judicial station which he held, and of the suffrages of his fellow-citizens for the important office for which he was a candidate; that the supreme court had passed on the construction of the libellous article in question in accordance with these views, and had determined that the paper was not susceptible of an innocent construction, but was libellous in its character, and it would therefore be their duty so to consider it in the verdict they should give. The judge further remarked, that the *only other point* necessary to be considered, whether the plaintiff was entitled to a verdict or not, was, whether the defendant had been proved to be *guilty of publishing the libel* in question, and upon that point submitted to them the testimony of the witnesses, and after some observations on the subject of the amount of damages gave the cause to the jury, who found a verdict for the

1841.

Dolloway
v.
Turrill.

plaintiff with $800 damages.   The defendant having ex-
cepted to the decisions of the judge, and to the charge de-
livered by him, moved the supreme court on a bill of ex-
ceptions for a new trial: which motion was denied, and
judgment was entered for the plaintiff.

The following opinion was delivered in the supreme
Court:

*By the Court*, NELSON, C. J.   The publication of the
libel was sufficiently proved by the witnesses *Martin* and
*Allen*.   After this, it was entirely competent to admit evi-
dence of the extent of the circulation, and for this pur-
pose other papers, (besides those specified in the declara-
tion) containing the article were admissible in evidence.
A party, putting in circulation a libel, is answerable for
the extent that may be given to it.   The notice did not
amount to a justification.   The import of the libel was de-
termined by the court on the former motion for a new trial,
17 *Wendell* 426: and it has now been tried in conformity
to the principles there laid down.   It is impossible to in-
terfere with the verdict without overruling the views there
taken, of the correctness of which we have seen no reason
to doubt.                              New trial denied."

The defendant sued out a writ of error.   The case was
argued in this court by

*M. T. Reynolds*, for the plaintiff in error.

*J. A. Spencer* and *S. Beardsley*, for the defendant in
error.

*Points submitted and argued on the part of the plaintiff
in error:*

I. The judge erred in refusing to submit to the jury the
question of fact, " In what sense the words were used ?"

II. The judge erred in deciding and declaring to the
jury, " that the libel contained an unequivocal *charge* of offi-

cial corruption, and that it was their duty so to consider it."

III. The judge erroneously charged the jury, " that upon the question whether the plaintiff was entitled to a verdict or not, it was only necessary to consider whether the defendant was guilty of the publication." 9 *East.* 93. 7 *Wendell* 568. *Holt's Law of Libel*, 243. 3 *Camp. N. P.* 461. 12 *Johns. R.* 239. 1 *R. L.* 515.

*Points submitted and argued on the part of the defendant in error:*

I. The circut judge properly excluded the defendant's evidence of justification. The notice was wholly defective. It alleged no corrupt or improper motive in the plaintiff in putting his signature to the affidavit. It might have been done through the merest inadvertence, and in such case would not have been a violation of his oath of office.

II. The notice must be equivalent to a plea of justification in *substance*. The statute only authorizes a party to give notice of such matters which, if pleaded would be a bar to the action; and of these alone can evidence be given on the trial, in the same manner as if pleaded. This has long been the settled doctrine of the law, and there is no good reason for overturning it. If the libeller means to charge official corruption, let him say so in his notice, as he must in a plea. This will secure to him the advantage of the law, and cast upon him its responsibilities. 2 *R. S.* 277, § 24. *Shepard* v. *Merrill*, 13 *Johns. R.* 475. *Mitchell* v. *Borden*, 8 *Wendell*, 570.

After advisement, the following opinions were delivered:

The CHANCELLOR read an opinion for affirmance of the judgment, which has not been received by the reporter.

*By Senator* LEE. It appears to me there is and at all times has been, a disposition on the part of judges in our

courts of law, in actions for slander, whether written or oral, to assume the duties not only of judges, which properly belong to them, but also those which belong to the jury, in this: that the courts have from time to time assumed that it was for them, authoritatively to decide on the intent and tendency of words spoken, or papers written, charged as slanderous or libellous, and to take from the jury the right to pass in any manner thereupon; and to deny to defendants the power to justify by giving the truth in evidence, or by encumbering the exercise of the right with so many difficulties and embarrassments as in effect to amount nearly to a denial thereof. It is certain such was the course of the courts in cases of criminal prosecutions for libels, until the evil became insufferable, and the legislature, to remedy it, passed a declaratory act, securing the right of the defendant in such cases to give the truth in evidence to the jury, in his defence; and declaring that if it should appear to the jury that the matter charged as libellous was true, and that it was published with good motives and for justifiable ends, the party should be acquitted; giving to the jury the right to determine the law and the fact. So important is this right esteemed by the people of this state, as a protection to the liberty of speech and the freedom of the press, that they have incorporated it in their bill of rights; and for its still greater security and more inviolable preservation, have embodied it in the fundamental law, the constitution of the state. The solemnity of this procedure on the part of the legislature, and by the people of this state, in the exercise of their highest acts of sovereignty, shews the great importance of the right thus sought to be protected, to wit, the right to excuse themselves on charges brought against them for words spoken or written, by giving the truth in evidence to the jury, who are made the judges not only of the truth of the words spoken or written, but of the motives and effect thereof. If these principles are fairly kept in view and carried into operation by the courts, in the spirit that

1841.

Dolloway
v.
Turrill.

led to their adoption, every citizen of this state, or other person within its jurisdiction may freely speak, write and publish his sentiments on all subjects, so that he keep within the rule: that he speak or publish only the truth, and that, with good motives and for justifiable ends; and these facts he may show in his defence, and give in evidence to the jury for them to pass upon. The allowance of this right is essential to the existence of a free government; and its enjoyment should be extended by the courts in the most liberal manner. It should be guarded by courts, jurors and the people at large, with the most sedulous care, and should not be embarrassed with needless technicalities.

I cannot avoid the conclusion, from cases coming under my own observation as well as those appearing in the books, that the tendency of the decisions is, to hedge around and protect plaintiffs in actions of slander generally as if they were the particular favorites of the courts; and to embarrass defendants with difficulties, as if it were desirable to prevent their giving the truth in evidence in justification. In all cases but those of slander, the defendant may with impunity plead or give notice of any matter of defence that he is advised may be available, and that he may hope or expect to be able to prove; and if he fail to make out his defence, he sustains no injury thereby. Not so in actions of slander. If the defendant in such action fail to prove such defence, no matter how honestly he may have believed it true and that he could prove the same, such attempt is set down as conclusive evidence of malice, and is followed with a heavy increase of the sum to be awarded to the plaintiff. One would think that this consequence following such attempts at justification, courts would be disposed to let in the defence, if the party can make it, on the most simple notice that would apprise the adverse party of what he had to meet; but this is not the case. The defendant is not permitted to prove the truth of the words he is charged with having written, spoken or

published, on a simple notice thereof, but he must in addition give notice that he will prove that the act or thing done by the plaintiff was done with wicked or corrupt motives, such as the defendant never charged, imputed or dreamed of, if the plaintiff in his declaration has charged that he the defendant so *intended*. Technical rules have been adopted in the action of slander, the effect of which (as in the case before us,) is to deny to the defendant the right to prove that every word he has uttered or written is true; and that the same was published with good motives and for justifiable ends. An article is published of the plaintiff, charging him with having officially certified that an affidavit was sworn to before him, by the person whose name is thereto signed, when no oath was in fact administered. This may have been an inadvertence, or it may have been done corruptly. The plaintiff in his declaration charges that it was intended to impute to him that he did the act wickedly and corruptly; and then in order to prove the truth of the words spoken or written, the courts require the defendant to plead or give notice that he will prove the truth of the charge, and that the act was done wickedly and corruptly. The courts say there is no hardship in such requirement; but is there not a hardship where the defendant knew that the fact published was true, and believed that its publication would be useful to the community, although he had no knowledge of the motive or intent with which it was done, and made no charge in relation thereto. In my opinion, the decision in this case excluding the evidence offered for the defence on the trial was wrong; and the notice was amply sufficient to entitle the defendant to prove that the facts stated in the paper charged as libellous were true, and that the same were published with good motives and for justifiable ends.

The statute authorizing evidence of defence to be given under a notice accompanying the plea of the general issue, was enacted for the purpose of simplifying the practice

and rendering pleadings more easy; and the courts have often decided in consonance therewith, that a notice was sufficient if it contain such a statement of the special matter as will prevent the plaintiff from being taken by surprise. *Chamberlin* v. *Gorham*, 20 *Johns. R.* 144. And again: in the same case in this court, *Id.* 746, it is said the notice ought to be so particular as to enable the plaintiff to come prepared to meet the facts stated therein. Try the notice in this case by these rules, and I think it will be found sufficient. But it is said a practice has been adopted establishing the rule contended for in this case, which seems confined to actions of slander, and the counsel have cited on the points two cases in support of this position, viz: *Shepard* v. *Merrill*, 13 *Johns. R.* 475, and *Mitchell* v. *Borden*, 8 *Wendell*, 570. In the first of these cases, no authority is cited, and the opinion applicable to this question was wholly unnecessary for the decision of the case; it is therefore a mere *obiter dictum*, and not the law of the case. In that case the plaintiff alleged that the defendant had charged him with *stealing his shingles*, and the notice was that the defendant would prove that the plaintiff sold the shingles, and then denied any knowledge of them. This was not a notice that he would prove the truth of the words spoken; it was nothing more, as the court in that case say, than that he would prove not theft but *lying*, and a *wrongful conversion*. In *Mitchell* v. *Borden*, the court based their decision entirely upon that in *Shepard* v. *Merrill*. I perceive no good reason for requiring a notice in actions of slander to be more specific and technical than in other actions; but on the contrary, I can imagine many that forbid it.

On the first trial of this cause the notice was held sufficient, and the defendant proved his justification under the direction of the circuit judge to the satisfaction of the jury, who found for the defendant. The judge then charged the jury, that if the paper charged as libellous, merely intended to charge the plaintiff with inadvertence, or an

omission to swear McNair to the affidavit by mistake, and inadvertence or mistake had been proved, that the defendant had justified and would be entitled to a verdict; but if the paper charged the plaintiff with official corruption, which it was their province to determine, then, in order to justify, the defendant was bound to prove the plaintiff guilty of official corruption, and the proving a mere mistake or inadvertence would be no justification. I think that charge was right, and that the intent of the defendant, and the import of the words used were properly submitted to the jury. In the opinion of Lord Chief Justice De Grey, delivered in the house of lords in *The King* v. *Horne*, cited with approbation by the supreme court in *Van Vechten* v. *Hopkins*, 5 *Johns. R.* 221, it is said, " It may happen that a writing may be so expressed, and in such clear and unambiguous words, as that it may amount of itself to a libel; in such a case, the court wants no circumstance to make it clearer than it is of itself." This is stated as an instance that may occur where the court needs not the aid of a jury; but the court does not even in such case prohibit the jury passing upon it, or intimate that it would be unsafe to leave it to them. But," his lordship proceeds, " if the terms of the writing are *general, ironical,* or spoken by way of *allusion* or *reference,* although every man who reads such writing may put the same construction upon it, *it is by understanding something not expressed in direct words:* and it being a matter of crime, and the party liable to be punished for it, there wants something more. It ought to receive a judicial sense, whether the application is just, and the fact, or the nature of the fact on which that depends, *is to be determined by the jury."* In *Tempest* v. *Chambers,* 1 *Starkie's R.* 56, Lord Ellenborough, in his charge to the jury, told them that he thought the words did not import a charge of felony, but he left it to them, and said, if they thought the defendant intended subtantially to impute a charge of felony to the plaintiff, that then he would be entitled to their verdict,

1841.

Dolloway
*v.*
Turrill.

**1841.**

**Dolloway**
**v.**
**Turrill.**

but not otherwise. The jury found for the plaintiff. In *Delany* v. *Jones*, 4 *Esp. R.* 191, the same learned judge left it to the jury to say whether the paper charged as libellous, imputed to the plaintiff the crime of bigamy, as alleged by the plaintiff. In *Dexter* v. *Taber*, 12 *Johns. R.* 240, in an action of slander, the plaintiff charged that the defendant said to him: *You are a thief; you are a damned thief.* The proof was: *You are a thief; you stole hoop-poles and saw-logs from off Delancey's and Judge Myers' land.* In this case the court say: It was correctly stated to the jury, that if the defendant intended to charge the plaintiff with taking hoop-poles and saw-logs, already cut, it was a charge of *felony;* but if he only meant to charge him with cutting and carrying them away, it was only charging him with a *trespass;* and that in what sense the words were intended to be used was for the jury to determine. The court add: this point is well settled both in our own and in the English courts, and cite 1 *Johns. Cas.* 279. *W. Black. R.* 959. *Cowp.* 278—9 *East.* 96. This case seems to me strongly in point to support the charge of the circuit judge on the first trial of this cause; and I should think it was before him when he delivered the charge. In *McKinly* v. *Rob.* 20 *Johns.* 356, the court say the *intent* must be collected from the words used. Where they have a certain definite meaning, the jury *cannot rightfully* indulge in conjectures not warranted by the legal import of the words; but if it is doubtful whether the words impute crime, or may be satisfied by ascribing to them a meaning which renders them not actionable, then the intent is a fair subject of inquiry before the jury; and in the recent case in this court of *Ryckman* v. *Delavan*, not yet published,* *Senator* VERPLANCK lays down the rule as established by the cases in this state and in England, that whenever the words are capable of more than one construction, it is the province of the jury to determine in what sense they were meant.

---

* Since published in 25 Wendell, 186.

1841.

Dolloway
v.
Turrill.

In the case before us are not the words charged as libellous, capable of more than one sense ? or in the language of the case of *McKinly* v. *Rob.* may they not be satisfied by ascribing to them a meaning which renders them not actionable ? Is not the paper, in this case, charged as libellous expressed, in the language of De Grey, C. J., in *general terms*, imputing crime only by reference to some disposition or design not expressed ? And if so, as he says, although all men who read it put the same construction upon it, *yet it is by understanding something not expressed in direct words;* it wants something more, it must receive a judicial construction, whether the application is just, and the fact or the nature of the fact on which that depends is to be determined not by the court, but by the jury. This case I think shows the danger to the citizen in allowing cases of this nature, in any instance, to be taken from the jury where the action is to be sustained. It is certain that in words, the plaintiff was not charged with officially certifying that the affidavit was sworn to before him when it was not, intentionally, wickedly and corruptly, and not inadvertently and by mistake, and yet that must so be found to sustain the action. The supreme court in granting the new trial, say that in certain cases where there is some question whether there is an imputation of crime, the jury have a right to pass on the question of intent, as to the sense of the publication, and how it was understood, but that in this case, " Nothing can be more clear than that the defendant intended to charge the plaintiff with certifying to a false fact from a bad motive. It must have been so understood by every person who read the publication." This understanding, if arrived at, must be by inference and not from express words. The learned judge, when he expressed that opinion, had before him evidence that twelve good and lawful men under oath, had declared that they did not so understand that publication. See here the fallibility of human judgment, and the uncertainty of human opinion. The learned judge gave the construction to this

publication, such as he supposed would necessarily strike the common mind; and twelve intelligent, plain but honest men, inhabitants of the county where it was published, charged particularly with the construction to be given to the publication, had declared under oath, that they came to a conclusion of its meaning entirely opposed to that of the learned judge. A distinguished jurist has said, and I think correctly, " that there is no specific and precise definition to be found, of what facts and circumstances constitute a libel; and that consequently it is difficult if not impossible to pronounce that any writing is *per se*, and exclusive of all circumstances, libellous; that its libellous character must depend on its intent and tendency, and the one and the other of which being matter of fact, must be found by the jury: per HAMILTON *arguendo*. 3 *Johns. Cas.* 360.

I am persuaded that public policy, the best interests of the community, and the protection of the liberty of speech and of the press, will be best promoted by extending large and liberal power to the jury in all actions of slander, written or unwritten, in civil as well as criminal prosecutions; and I cannot believe that there is any danger in permitting a jury, under the charge of the court, to pass on the question as to the popular sense of the words used, the intent and tendency of the publication, or the words spoken, and whether they are libellous or otherwise. In the case of the *New-York Ins. Co.* v. *Walden*, 12 *Johns. R.* 519, Chancellor Kent, in delivering the opinion of this court, concludes a very able argument, vindicating the rights and duties of jurors, and the great importance of preserving to them their proper and legitimate power to pass on all matters of fact in the largest sense, by observing, " The case before us is of comparatively trifling importance, but the distinction I have suggested goes to the very root and essence of trial by jury, and may become of inestimable value, and perhaps of perilous struggle, when the present generation shall have ceased to exist. I am

disposed to hand to posterity the institution of juries as per-
fect in all respects as we now enjoy it; for I believe that it
may hereafter be found no inconsiderable security against
the systematic influence and tyranny of party spirit."
These views of the Chancellor seem to me strikingly ap-
plicable to actions for libels.

I am of opinion in the case before us, that the jury
should have been charged as the judge was desired to
charge them, that they had the right to decide from the
paper called libellous in what sense the words were used,
and whether they imported a charge of inadvertence in the
plaintiff in certifying that he swore the person to the
truth of the affidavit, when he had not done so, or whether
they imputed official corruption—and that if they found
they were used in an innocent sense, that then they were not
actionable. From my great respect for the supreme court
I differ from them with hesitancy and regret; but being
persuaded that the tendency of their decision is to encour-
age suits for slander, (sometimes rendered necessary for
the protection of character wickedly and unjustly assailed,
but much more frequently prosecuted by men of question-
able character, from a wicked spirit of litigation and a sor-
did hope of gain,) and to shackle and embarrass the free-
dom of discussion, of speech, and of the press, by surround-
ing the defence of justification with unnecessary and
oppressive technicalities and difficulties, I have felt it my
duty thus to differ from them.

I think the judgment below should be reversed.

By *Senator* Root. The errors in the charge and deci-
sions of the judge at the circuit, which were noticed and
insisted upon by the counsel for the plaintiff in error, are
sufficient to induce me to vote for a reversal; and I should
have contented myself with a silent vote, or at most with
an oral exposition of my views upon the question, had it
not been for the circumstance that there are two very im-
portant, and I think, controlling points in the case, which

were not made or noticed by the counsel in argument. I know it has been said that the court, in its decision, is not to regard any matter not raised by the counsel in the points submitted; but, in my opinion, a court in the last resort, whose constitutional power and duty it is to correct all errors, if any there be, in all cases brought up for its re-examination, ought to consider the same whenever found in the case, whether urged by counsel or not, else a precedent may be established controlling future decisions in like cases, which may materially change the law of the land, growing out of the inattention of counsel, or a too deferential submission to the opinions of an inferior court.

The two points in the case which I consider important, and which were not noticed by counsel, are: 1. The exclusion of the evidence offered, to prove the truth of the several matters specified and charged in the alleged libel, on the ground of the insufficiency of the *notice of justification;* and 2. The exclusion of the evidence under the plea of the *general issue.*  FIRST: By the statute for the amendment of the law, which has long been in force in this state, the defendant may give in evidence, under the general issue, any matter which would be a bar to the action.  Under the plea in this cause, the defendant had given notice that he should give in-evidence and prove on the trial the truth of all the matters stated and charged in the publication. The notice is as full and as broad as the charge itself, and recites all the matter and I think all the words contained in it.  But the supreme court has decided that the notice did not amount to a justification, as the court on a former occasion, in this cause, had held, that the publication was a libel, as the defendant intended to charge the plaintiff with corrupt misconduct in office.  Thus, it appears that the court assume to decide, *as a question of law,* upon the intention of the defendant and the goodness of his motive, without allowing the jury, on proof of the facts, to determine whether those proofs were not as broad as the charge; and that, if the latter implied a charge of corrupt official

misconduct, the former would allow a like implication. The whole question, and indeed all the questions of intention and motive, ought to have been left to the jury.

SECOND. Proof of the truth of the publication ought to have been allowed under the general issue. If not before its adoption, it surely ought to be allowed under the new constitution of this state. By the 8th section of the 7th article, it is ordained, that " In all prosecutions or indictments for libels the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact." I am aware it has been said and believed by gentlemen eminent at the bar, that this provision of the constitution has reference exclusively to criminal prosecutions. Let us examine the text and context, and other correlative matter, and see if their faith is well founded. The text is, " In all *prosecutions or indictments* for libels, the truth may be given in evidence to the jury." It is not " *information* or *indictment*," the only modes ever known to our laws of prosecuting criminally for libels. The word " *prosecutions* " means *civil actions.* The constitution secures to the defendant that trial which he might always rightfully claim. It also secures to him the same trial if prosecuted criminally by *indictment*. The word " prosecution " is defined by Mr. Webster, in his Dictionary, (after having given 1. Its general definition,) as follows: 2. " The institution and carrying on of a suit, in a court of law or equity, to obtain some right, or to redress and punish some wrong;" and 3. " The institution or commencement and continuance of a criminal suit." The ablest lexicographer in our language has given to the word the meaning of a *civil suit*, in preference to that of a *criminal prosecution*, and he has placed them in the same order the convention had done in the constitution.

1841.

Dolloway
*v.*
Turrill.

**1841.**

*Dolloway*
*v.*
*Turrill.*

It has also been urged, that the word " *acquitted,*" in the section referred to, has reference exclusively to persons criminally prosecuted, and therefore that section refers exclusively to *criminal prosecutions.* Let us again recur to Mr. Webster: " Acquitted," set free, or judicially discharged from an accusation; released from a debt, duty, obligation, charge, or suspicion of guilt." Thus, it appears that the word " *acquitted* " has reference to both civil and criminal prosecutions, and therefore we must all admit that the convention could not have chosen a more apt term concisely to express their meaning.

It has also been said that the convention did not intend to include civil suits in this provision of the constitution, because the defendants in such suits already possessed those rights, and had no need of further security. This construction admits that the defendant in this cause is possessed of all the rights for which I contend. The legislature have not altered the law, and if judges in their decisions have departed from it, this court is in duty bound to restore it to its former purity. But if the convention omitted to secure the rights of the citizen in his defence of a civil suit, because they were well enough secured before, why was there not the same omission in respect to his rights in criminal prosecutions ? To say the least, these rights were as well secured. By the act of 1805, *Statutes of that year, p.* 232, substantially re-enacted in the two subsequent revisions, it was provided, " that on every indictment or information for libel, the jury who shall try the same, shall have a right to determine the law and the fact;" and the truth was allowed to be given in evidence as a justification, provided it should be made to appear that the publication had been made from good motives and for justifiable ends. This act appears to have been merely declaratory. Its preamble is in these words: " Whereas, doubts exist whether on the trial of an indictment or information for a libel, the jury have a right to give their verdict on the whole matter in issue," and then the enactment follows: " Be it

therefore declared and enacted, &c.—that on every such indictment or information the jury," &c. The doubts alluded to in the act had arisen from the decisions of English courts, in derogation of the common law, and prior to the passage of the celebrated bill of Mr. Fox, restoring to the jury their appropriate powers and functions. Our courts had adopted the principles laid down by Lord Mansfield in such cases, and our legislature followed suit to the British parliament, in restoring the law to the standard of common sense. But as to the *intention* of the framers of the constitution in reference to the 8th section of the 7th article: having had the honor of a seat in the convention, I have no hesitation in saying, that in the discussions in that body on the subject matter of that section, the several members who spoke upon the question, considered the term *prosecutions* as referring to *civil suits;* and in this it will be found I am borne out by the reports of the Debates of the Convention, at pages 90 and 91. In referring to a proposition which had been made, Mr. *Young,* a delegate from Saratoga, remarked: " As the law would then be constituted, the judge would decide as to the motive of the publisher before it came to a jury: thus a suit is brought, the party puts in his plea of justification, setting forth the truth and the circumstances calculated to make out his case; the prosecutor demurs to the plea, and it is then for the court to say, before the matter can be submitted at all to the jury, whether the plea be sufficient or the motives of the publication good. Thus, sir, in fact taking the matter quite out of the hands of the jury." To which Chief Justice *Spencer,* a delegate from Albany, answered that it had been supposed that it was " intended to transfer to the court the privilege which now belongs to the jury of deciding on the motives of persons making libellous publications. Sir, there was no intention of taking the committee by surprise, but to appeal to them whether under certain circumstances it might not be safe to entrust the court with the discretion of deciding on motives;" but he did not deny

that the view which had been taken by Mr. *Young* in applying the subject matter of debate *to civil prosecutions* was correct.

For these reasons as well as for those first suggested, I shall vote for a reversal of the judgment of the supreme court.

*Senator* VERPLANCK observed that he fully concurred in the views presented by Senator *Lee*, in the opinion delivered by him, as to the right of a defendant in an · action for a libel to have ·the question passed upon by a *jury*, whether the publication is or is not libellous; but another ground for the reversal of the judgment had now been suggested by a venerable senator which conformed with his first impressions as to the true meaning of the clause of the constitution which had been referred to. Uncertain however whether the question might not have been otherwise settled by adjudication, he had not made up his mind as to the vote he should give in this case in reference to it; though now he understood that there had been no decision on the question.  He then adverted to the provision in the constitution, and observed that the words *prosecutions* and *acquitted* occurring in the section had caused him at first to doubt, whether the provision could have been intended to embrace *civil suits;* but he said the word *prosecutions* in its broadest acceptation, relates to all suits, though as commonly understood, it applies most appropriately to suits for *torts,* whether they be civil or criminal suits.  As to the word *acquitted,* it was frequently used by Lord *Ellenborough,* in speaking of defendant's obtaining verdicts in actions of slander.  The right of a defendant to give the truth in evidence in an action for a libel, is as much within the mischief intended to be remedied, as when he is prosecuted by indictment for a libel.  The reasoning of Chancellor *Kent,* in the famous case of *The People* v. *Croswell,* 3 *Johns. Cas.* 337, applies as well to *civil* as to *criminal* cases.  He hesitated, how-

ever, in placing his decision upon this ground, as the point had not been argued by counsel.

The CHANCELLOR protested against the decision of the case upon grounds not presented on the argument and upon which the plaintiff below had not been heard by counsel. He also expressed his surprise at the construction given to the provision in the constitution, and observed that he would venture to say that no lawyer had ever before supposed that the provision as to the giving the truth in evidence in prosecutions or indictments for a libel, extended to *civil suits* for a libel between party and party; but if it did, surely the evidence was not admissible under the ˈ ˌa of the general issue. To his mind it was evident tˈ ˌt the provision was not intended to embrace civil suits for a libel, because its effect, instead of operating favorably to defendants, which was its manifest object, would have a direct contrary tendency. At common law, the truth of a publication alleged to be libellous may be given in evidence, be the motive ever so bad, or the end ever so unjustifiable, provided the facts be properly pleaded or notice given of them; but if the clause of the constitution in question be construed to extend to *civil suits*, the truth will no longer be a justification in such suits, unless the publication be made with good motives and for justifiable ends.

On the question being put, *Shall this judgment be reversed?* all the members of the court present who had heard the argument, (except the CHANCELLOR and *Senators* CLARK, PAIGE and SKINNER,) voted in the *affirmative;* the Chancellor and the three senators named, voted in the *negative.* Whereupon the judgment of the supreme court was REVERSED.