[No. 625-1.     Division One—Panel 1.     July 12, 1971.]

HARRIET EDDY, *Appellant,* v. W. F. MOORE, *Respondent.*

*Thomas J. Isaac,* for appellant.

*A. L. Newbould* and *J. Roger Nowell,* for respondent.

UTTER, J.—Harriet Eddy was arrested and charged with assault by the Seattle Police Department. After her arrest,

she was fingerprinted and photographed, and the finger-prints and photographs were placed in the files of the police department. At trial, the charges against her were dismissed. She then demanded from the Chief of Police, one W. F. Moore, the return of her fingerprints and photographs. Chief Moore refused, and Mrs. Eddy sought a petition for a writ of mandate ordering him to show cause why they should not be returned. The trial court refused to issue the writ and held she had no legal right to their return.

The record on appeal is before us on an agreed statement of facts. There was, apparently, no testimony taken in the trial court. No findings of fact are contained in the agreed statement of facts, and there is, therefore, no factual data available to us to offer either any justification for retention of the prints and photographs or to indicate to us what, in fact, is the ability of the police department to keep its files and records confidential and restricted from scrutiny.

Mrs. Eddy's assignments of error are all directed to the failure of the court to recognize her right of privacy in her fingerprints and photographs, and the violation of this right by the failure of the police department to return them, without factual justification, upon her acquittal. Respondent, on the other hand, urges there is implied statutory authority for the retention of the fingerprints and photographs by the criminal identification bureau of all persons arrested for specifically enumerated crimes.[1] He further

---

[1] The Washington statute provides that all persons arrested for any felony or gross misdemeanor or other specified categories shall submit to the taking of their fingerprints, photographs, physical description and other identifying data. (RCW 72.50.040 and RCW 72.50.060.) The only statute dealing with the eventuality of acquittal or dismissal of the charges, RCW 72.50.140, provides:

In the event that (1) the person is not convicted of any of the charges for which he was arrested for the reason that such charges are not brought against him; or (2) such charges are brought and have been dismissed or the person has been acquitted; all such records of identification shall be confidential to the extent provided for in RCW 72.50.100 except that such facts may be released on order of court where such facts are material to issues in any litigation.

urges that an acquitted citizen has no right to the return of photographs and fingerprints in absence of a statute directing their return and that there is no legal duty requiring him to return the identification data to the appellant.

There has been a substantial body of litigation concerning photographs and files maintained by the police and efforts made to obtain their return based upon an equitable right of privacy. These cases have held the decision to release or retain arrest records was within the realm of police discretion and have justified this holding by statements that the police, in protecting society should be granted sufficient authority to choose those things, including arrest records, which will enable them to most effectively and efficiently discharge their duty in protecting society.[2]

.The public display of an innocent person's photograph has been the exception to the general rule. Here, courts have justified their use of equitable powers in broad language:

We think that the publication of an innocent man's photograph in the rogues' gallery gives rise to sufficient grounds to sustain an injunction.

There is a right in equity to protect a person from such an invasion of private rights.

Every one who does not violate the law can insist upon being let alone . . .

*Itzkovitch v. Whitaker,* 115 La. 479, 39 So. 499 (1905),

---

[2]*Herschel v. Dyra,* 365 F.2d 17 (7th Cir. 1966); *Mabry v. Kettering,* 89 Ark. 551, 117 S.W. 746 (1909); *Sterling v. Oakland,* 208 Cal. App. 2d 1, 24 Cal. Rptr. 696 (1962); *State ex rel. Mavity v. Tyndall,* 224 Ind. 364, 66 N.E.2d 755 (1946); *State ex rel. Bruns v. Clausmeier,* 154 Ind. 599, 57 N.E. 541 (1900); *Downs v. Swann,* 111 Md. 53, 73 A. 653 (1909); *Miller v. Gillespie,* 196 Mich. 423, 163 N.W. 22 (1917); *State ex rel. Reed v. Harris,* 348 Mo. 426, 153 S.W.2d 834 (1941);*Roesch v. Ferber,* 48 N.J. Super. 231, 137 A.2d 61 (1957); *McGovern v. Van Riper,* 140 N.J. Eq. 341, 54 A.2d 469 (1947); *Fernicola v. Keenan,* 136 N.J. Eq. 9, 39 A.2d 851 (1944); *Bartletta v. McFeeley,* 107 N.J. Eq. 141, 152 A. 17 (1930), *aff'd,* 109 N.J. Eq. 241, 156 A. 658 (1931); *In re Molineux,* 177 N.Y. 395, 69 N.E. 727 (1904); *People ex rel. Joyce v. York,* 27 Misc. 658, 59 N.Y.S. 418 (1899); *Hansson v. Harris,* 252 S.W.2d 600 (Tex. Civ. App. 1952); *Hodgeman v. Olsen,* 86 Wash. 615, 150 P. 1122 (1915); *Shaffer v. United States,* 24 App. D.C. 417 (Ct. App. 1904), *cert. denied,* 196 U.S. 639, 49 L. Ed. 631, 25 S. Ct. 795 (1905).

affirmed in effect by *Itzkovitch v. Whitaker,* 117 La. 708, 42 So. 228 (1906). In these display-of-photograph cases, courts expressed a sensitivity to the rights of those who had been acquitted of criminal charges. In *Downs v. Swann,* 111 Md. 53, 64, 73 A. 653 (1909), the court dissolved an injunction restraining the taking of photographs as the result of the failure to allege that it was the custom of police officers to display the photographs, but added,

> we must not be understood by so doing to countenance the placing in the "rogues gallery" of the photograph of any person, not a habitual criminal, who has been arrested but not convicted on a criminal charge, . . . Police officers have no right to needlessly or wantonly injure in any respect persons whom they are called upon in the course of their duty to arrest or detain, . . .[3]

These cases have been amalgamated into the current literature involving the development of an equitable right of privacy. This right was first delineated in the landmark article, S. Warren & L. Brandeis, *The Right to Privacy,* 4 Harv. L. Rev. 193 (1890). In a subsequent discussion of the expansion of the doctrine, William L. Prosser,[4] in his article on privacy, develops an analysis which would recognize four distinct kinds of invasion of four different interests of a plaintiff tied together under a common name of a right of privacy. These are:

1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.

2. Public disclosure of embarrassing private facts about the plaintiff.

3. Publicity which places the plaintiff in a false light in the public eye.

4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.

---

[3]*See also State ex rel. Mavity v. Tyndall, supra* note 2; *Schulman v. Whitaker,* 117 La. 704, 42 So. 227 (1906); *Downs v. Swann, supra* note 2; *State ex rel. Reed v. Harris, supra* note 2; *McGovern v. Van Riper, supra* note 2; *Fernicola v. Keenan, supra* note 2.

[4]W. Prosser, *Privacy,* 48 Cal. L. Rev. 383 (1960).

Prosser does not find any intrusion into a person's private affairs where police, acting within their powers, take his photographs and fingerprints or measurements.[5] He does, however, find a violation of a right of privacy in placing one in a false light in the public eye where there is the inclusion of the plaintiff's name, photographs and fingerprints in a public "rogues' gallery" of convicted criminals, when he has not in fact been convicted of a crime. Prosser notes, "Although the police are clearly privileged to make such a record in the first instance, and to use it for any legitimate purpose pending trial, or even after conviction, the element of false publicity in the inclusion among the convicted goes beyond the privilege."[6]

The Washington courts have not taken a position, prior to this case, on the right of a person acquitted of a crime to the return of their fingerprints and photographs taken pursuant to arrest. In *Hodgeman v. Olsen,* 86 Wash. 615, 150 P. 1122 (1915), the plaintiff had been confined in the state reformatory, paroled, and then eventually granted a full pardon by the governor. After the pardon was granted, Hodgeman sought the return of his identification records held by the reformatory. The court refused to order their return and noted that where the pictures were being held as a part of the records of an institution, there was no legal duty to destroy them, in absence of a statute imposing that duty.

The court expressed doubts about a case where no conviction was obtained and noted: "We do not hold that any official has the implied power to take and retain the picture and measurements of persons merely accused of crime. That question is not before us."

The cases dealing with the equitable right of privacy and the comments of Prosser and other commentators take us to the threshold of a recognition of a right in an individual to be free of improper use of his fingerprints and photographs by the state but stop short of establishing a

---

[5]W. Prosser, *Privacy,* 48 Calif. L. Rev., note 4, at 391.
[6]W. Prosser, *Privacy,* 48 Calif. L. Rev., note 4, at 399-400.

constitutional right of privacy and grant too much discretion without need for justification, to the state to determine what records are needed to effectuate the law enforcement function.

In *Griswold v. Connecticut*, 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965), a law forbidding the dissemination of birth control information was struck down as a violation of the right to marital privacy. The court, in the majority opinion written by Mr. Justice Douglas, expanded the right of privacy beyond the limits of the enumerated protections found in the First, Second, and Fifth Amendments and gave it independent existence. The court noted,

> specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. . . . Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one, as we have seen. The Third Amendment in its prohibition against the quartering of soldiers "in any house" in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

The court noted in giving substance to the right that it was dealing with "a right of privacy older than the Bill of Rights" and held that a law forbidding the use of contraceptives could not stand in light of the familiar principle, "so often applied by this Court, that a 'governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protective freedoms." This view was concurred in by four other judges.

Justice Goldberg in a separate concurring opinion, quoting from *Snyder v. Massachusetts,* 291 U.S. 97, 105, 78 L. Ed. 674, 54 S. Ct. 330, 90 A.L.R. 575 (1934), stated the due process clause protects those liberties that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental" and that the Ninth Amendment "simply lends strong support to the view that the 'liberty' protected by the Fifth and Fourteenth Amendments from infringement by the Federal Government or the States is not restricted to rights specifically mentioned in the first eight amendments." Specific guidelines in the determination of what a fundamental right is were suggested by Mr. Justice Goldberg as being rooted in the

> "traditions and [collective] conscience of our people" to determine whether a principle is "so rooted [there] . . . as to be ranked as fundamental." *Snyder* v. *Massachusetts,* 291 U. S. 97, 105. The inquiry is whether a right involved "is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' . . . ." *Powell* v. *Alabama,* 287 U. S. 45, 67. "Liberty" also "gains content from the emanations of . . . specific [constitutional] guarantees" and "from experience with the requirements of a free society." *Poe* v. *Ullman,* 367 U. S. 497, 517 . . .

*Griswold,* 381 U.S. at 493. His opinion was concurred in by Mr. Chief Justice Warren and Mr. Justice Brennan. Mr. Justice Harlan and Mr. Justice White also wrote separate concurring opinions holding that the right of marital privacy is one of the fundamental unenumerated rights protected by the due process clause of the Fourteenth Amendment, thus making five judges who selected the fundamental rights doctrine as a ground for decision.

This doctrine has received further support since *Griswold.*[7]

---

[7] In *Loving v. Virginia,* 388 U.S. 1, 18 L. Ed. 2d 1010, 87 S. Ct. 1817 (1967), the court on an alternative ground found a Virginia anti-miscegenation statute violated the freedom to marry protected by the due process clause. The right of interstate travel was also found to be a fundamental right in *Shapiro v. Thompson,* 394 U.S. 618, 22 L. Ed. 2d

The development of a constitutional right of privacy in *Griswold* was preceded by numerous rulings of the court emphasizing the rights in areas closely allied to the right of privacy.

The rights of associational privacy, political privacy, anonymity in public expression, privacy of the body, and a right of privacy of counsel were all rights recognized by the courts prior to *Griswold*.[8]

It was noted in the early case of *Boyd v. United States,* 116 U.S. 616, 630, 29 L. Ed. 746, 6 S. Ct. 524 (1886) that privacy was a sacred right, the court stating:

> The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment.

A recent case, subsequent to *Griswold,* further expands the scope of rights considered to be fundamental. *Menard v. Mitchell,* 328 F. Supp. 718 (D.C. 1971). Menard was arrested on suspicion of burglary but after some incarceration was freed for lack of evidence to connect him with the crime. The California police, pursuant to state law, forwarded a record of his arrests along with a copy of his fingerprints to the FBI where they were on file at the time of the suit. Menard instituted an action in district court to have his record expunged from the files of the FBI and

600, 89 S. Ct. 1322 (1969) and *United States v. Guest,* 383 U.S. 745, 16 L. Ed. 2d 239, 86 S. Ct. 1170 (1966).

[8]See an excellent discussion of the development of these rights in A. Westin, *Science, Privacy, and Freedom: Issues and Proposals for the 1970's,* 66 Colum. L. Rev. 1205 (Part II 1966).

argued that under California law, a person taken into custody and later released without charges having been filed is deemed to have been only detained but not arrested.

The court of appeals, in a memorandum opinion, held they were without authority to order Menard's record expunged, as determination of the legality of an arrest record should be made in the first instance, by the California court, after his administrative remedies had been exhausted. They did hold, however, that they could limit the dissemination by the FBI of his arrest record and did so limit its dissemination to law enforcement agencies and agencies of the federal government.

We here deal with the question, not ruled upon by *Menard*, of the legality of the existence of a record of an acquitted person's fingerprints and photographs in police files. The determination of that question, in turn, hinges directly on whether there is a constitutional right of privacy in an acquitted person's fingerprints and photographs.

There is a direct correlation between the loss of individual privacy and the retention of arrest records. This correlation was specifically noted in *United States v. Kalish*, 271 F. Supp. 968 (D.P.R. 1967).

Kalish was arrested for failure to submit to induction and was, pursuant to this, fingerprinted and photographed. This arrest took place in spite of the fact that he had voluntarily surrendered himself to the jurisdiction, had indicated a willingness to be inducted, and had explained that his refusal to step forward to be sworn into the army was based upon advice of counsel, who was representing him in proceedings to have his selective service classification reopened.

Kalish was fingerprinted and photographed again when he actually did voluntarily enter the service a few days later. The charges under which Kalish was arrested were never prosecuted and Kalish brought an action seeking an order to expunge and destroy the photographs and fingerprints obtained upon his arrest.

The government resisted his motion contending that fingerprinting and other identification was not punishment; that although burdensome, it was a burden that must be borne for the common good and that, inasmuch as Kalish's army photographs and fingerprints were on file in any event, the elimination of the judicial source of fingerprints and photographs would not completely eradicate the information.

The court granted Kalish's motion and noted:

There can be no denying of the efficacy of fingerprint information, photographs, and other means of identification in the apprehension of criminals and fugitives. Law enforcement agencies must utilize all scientific data in society's never-ending battle against lawlessness and crime. When arrested, an accused does not have a constitutional right of privacy that outweighs the necessity of protecting society and the accumulation of this data, no matter how mistaken the arrest may have been.

However, when an accused is acquitted of the crime or when he is discharged without conviction, no public good is accomplished by the retention of criminal identification records. On the other hand, a great imposition is placed upon the citizen. His privacy and personal dignity is invaded as long as the Justice Department retains "criminal" identification records, "criminal" arrest, fingerprints and a rogue's gallery photograph.

The court answered the argument that no harm was done inasmuch as the fingerprints and photographs were already on file in army records, stating:

What the Government fails to consider is the affront on the personal dignity of the individual directly related to the source of the Justice Department's identification records. At some future date, use of these records may be needed for judicial or other governmental purpose. Whatever the use, should a citizen . . . be haunted by fingerprints labelled "criminal" or a rogue's gallery photographs, when he has no charges pending against him? I think not. The preservation of these records constitutes an unwarranted attack upon his character and reputation and violates his right of privacy; it violates his dignity as a human being.

An individual who has been arrested and then acquitted has an undeniably greater visibility to the police than other persons. His fingerprints, and more particularly his photograph, are available to be shown to other citizens as a potential suspect to be chosen in prearrest lineups, an identification procedure frequently used by law enforcement agencies. Increased police scrutiny resulting from an arrest record and its potential invasion of the individual's private life, if it occurs, should rest upon rational factors.

We do not mean to hold that the right of privacy an acquitted person has in his fingerprints and photographs is an absolute and complete bar to their retention. The value of fingerprints and photographs of an arrested person depends upon two factors: An assumption the individual arrested did in fact commit the crime for which he is accused and that his commission of this crime indicates a likelihood that other crimes will be committed. An acquittal seems to negate both premises. Where the only reason for the presence of an individual's fingerprints and photographs in the police file is based upon an arrest which has subsequently been voided by an acquittal and no further justification is made for the retention of these fingerprints and photographs, no rational basis for their retention remains.[9]

Although our state has not yet specifically recognized the existence of an independent right of privacy (*Lewis v. Physicians & Dentists Credit Bureau, Inc.,* 27 Wn.2d 267, 272, 177 P.2d 896, 899 (1947)), we have recently noted that after *Griswold,* there can be little doubt that "the right of privacy is enshrined as a constitutional doctrine." *State v. Rabe,* 79 Wn.2d 254, 267, 484 P.2d 917 (1971).

The challenge is to determine the dimensions of that right. Few things have been as basic to our legal system as the presumption of innocence, until proof of guilt beyond a

---

[9]*See* Comment, *Criminal Law — Constitutional Law — The F.B.I.'s Right to Retain and Disseminate Arrest Records of Persons Not Convicted of a Crime May Be Limited by the First and Fifth Amendments,* 46 Notre Dame Lawyer 825 (1971) and Comment, *Constitutional Law —Right of Police to Retain Arrest Records,* 49 N.C. L. Rev. 509 (1971).

reasonable doubt. In fact, the very word acquittal is defined to mean "judicially discharged from an accusation, . . . charge, or suspicion of guilt." 1A Words and Phrases 1205 (perm. ed. 1964). *Board of Comm'rs v. Johnson,* 31 Ind. 463, 466 (1869); *Dolloway v. Turrill,* 26 Wend. 383, 400 (N.Y. 1841).

> An arrest whether made with or without probable cause is to be sure a fact, but one that proves nothing so far as the actual conduct of the person arrested is concerned. An arrest without probable cause may still lead to conviction and one with probable cause may still result in acquittal. Under our system of criminal justice, only a conviction carries legal significance as to a person's involvement in criminal behavior.

*Menard v. Mitchell,* 328 F. Supp. 718 (D.C. 1971). The courts have recognized in *Kalish* and *Menard* that following an acquittal, the scales of justice required the balancing on one side of a plaintiff's legitimate concern over the improper use of, labeling, or existence of his fingerprints, photographs, and arrest records against the government's bald assertion of a right to hold them. We have now reached the point where our experience with the requirements of a free society demands the existence of a right of privacy in the fingerprints and photographs of an accused who has been acquitted, to be at least placed in the balance, against the claim of the state for a need for their retention.

We believe the right of an individual, absent a compelling showing of necessity by the government, to the return of his fingerprints and photographs, upon an acquittal, is a fundamental right implicit in the concept of ordered liberty and that it is as well within the penumbras of the specific guarantees of the Bill of Rights "formed by emanations from those guarantees that help give them life and substance." *Griswold v. Connecticut,* 381 U.S. 479, 484, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965).

It will take a compelling showing on the part of the state to justify a retention of the fingerprints and photographs. As noted in the concurring opinion of Mr. Justice Goldberg in *Griswold:*

In a long series of cases this Court has held that where fundamental personal liberties are involved, they may not be abridged by the States simply on a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling," *Bates* v. *Little Rock*, 361 U. S. 516, 524. The law must be shown "necessary, and not merely rationally related, to the accomplishment of a permissible state policy." *McLaughlin* v. *Florida*, 379 U. S. 184, 196.

*See also Sherbert v. Verner*, 374 U.S. 398, 406, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963); *McLaughlin v. Florida*, 379 U.S. 184, 13 L. Ed. 2d 222, 85 S. Ct. 283 (1964); *NAACP v. Button*, 371 U.S. 415, 438, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963); *Bates v. Little Rock*, 361 U.S. 516, 4 L. Ed. 2d 480, 80 S. Ct. 412 (1960); *Thomas v. Collins*, 323 U.S. 516, 530, 89 L. Ed. 430, 65 S. Ct. 315 (1945).

We do not believe requiring law enforcement agencies to show a compelling necessity for retention of fingerprints and photographs of acquitted persons places an undue burden upon them. Law enforcement agencies must now bear the burden of justifying the obtaining of a search warrant for entry into a man's home. *Aguilar v. Texas*, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964).

The Washington statutes[10] governing what is done with fingerprints and photographs upon acquittal of an accused are too limited in their scope. Their failure to provide for return of the fingerprints and photographs upon acquittal, absent a compelling showing justifying their retention, is a constitutionally defective omission. The Seattle Police Department having made no compelling showing justifying the need for retention is directed to return the fingerprints and photographs to Mrs. Eddy.

The judgment is reversed.

HOROWITZ, C.J., and WILLIAMS, J., concur.

Petition for rehearing denied September 22, 1971.

Review denied by Supreme Court November 9, 1971.

---

[10]RCW 72.50.040, .060, .100 and .140.