Mrs. Raymond M. WHEELER, Next Friend of Harry Anthony Blackburn; Thomas Richard Bowen, alias Thomas Richard Brown; Wayne Eugene Funderburk; Marcus Corbett Helms; Merita Bridget Hummel; Joy Louise Kelley; Michael Dennis Lee; Jimmy Lee McKinney; Roberta Jean Shaw; Carlton Tadlock; Gay Dawn Smith and Mary Jean Wagner, Plaintiffs,

v.

J. C. GOODMAN, Jr., as Chief of Police of Charlotte, North Carolina; Robert M. Blackburn, as Clerk of Superior Court, Mecklenburg County, North Carolina; Captain William McCall; Sergeant L. L. McGraw; John Doe et al.; Richard Roe et al.; and Attorney General of North Carolina, Robert Morgan, Defendants.

No. 2431.

United States District Court
W. D. North Carolina,
Charlotte Division.

March 5, 1969.

**936**

George S. Daly, Jr., Casey & Daly, Charlotte, N. C., Charles F. Lambeth, Jr., Thomasville, N. C., and Adam Stein, Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiffs and North Carolina Civil Liberties Union.

Frank B. Aycock, III, G. Patrick Hunter, Jr., Henry W. Underhill, Jr., and William Allen Watts, Charlotte, N. C., for defendants.

Andrew A. Vanore, Jr., Asst. Atty. Gen., of North Carolina, amicus curiae.

## MEMORANDUM OF DECISION AND JUDGMENT

McMILLAN, District Judge.

### PRELIMINARY SUMMARY

This case was heard on February 13 and 14 and February 20, 1969, upon the petition of the plaintiffs, the "hippies," for injunctive and other relief against the Charlotte Police Department, the vice squad, and others. The court is of the opinion that although the petitioners' conduct under inquiry is fully shown to be unconventional, unproductive and unattractive by everyday standards, the conduct is not shown to be unlawful; that the constitutional rights of the petitioners to freedom of assembly and expression and association, and their rights to be secure in their private dwelling, free from unreasonable searches and seizures, have been violated and threatened and suppressed by the actions of the police; and the police are directed in this order to refrain from such actions in the future.

The court makes the following

### FINDINGS OF FACT

1. The plaintiffs, twelve in number, are minors varying in age from sixteen to twenty years, and pursuant to the rules of procedure have brought this action through a court appointed next friend, Mrs. Raymond M. Wheeler. Several of them lived and all of them visited from time to time at the "hippie house" at 216 East Kingston Avenue in Charlotte. In dress, manner, length of hair, speech, slouch and activity most of the plaintiffs appear to fit the "hippie" image. In court some wore beards and love beads. The gait and stance of the boys was anything but military. Some of the girls wore long pants. None fit the Horatio Alger picture of a young

person setting out to "strive and succeed." None had much money. Most had no job. Some appeared truly to have "tuned out of the rat race." Their rented house was old, dirty, ill-furnished and poorly maintained. There was conflict in the testimony as to the respective parts which the landlord, the plaintiffs and the police played in the condition of the house. Window panes were broken; the roof leaked; heat, when they had it, came from wood fires in the fireplaces up and downstairs. The plumbing froze interrupting the water supply to the toilet. Mattresses on the floor were the chief items of furniture. They had parties. Guests and visitors sometimes drank, sometimes smoked, sometimes played guitars and sometimes made other loud noises. Visitors were numerous—more numerous than "normal."

2. The "hippie house" was a two-story private home at 216 East Kingston Avenue in the Dilworth section of Charlotte. It was the private home of several of the plaintiffs at all times pertinent to this case. In November of 1968 it was rented through a real estate agent by Joy Kelley; her fiance, Carlton Tadlock; the plaintiff Michael Dennis Lee and two other boys not actual parties to the suit. They occupied the house sharing rent and expenses. They drew up some house rules about expense sharing, room assignment, noise, drinking visitors and other items, and put these rules in a little "blue book." The rent was fully paid up at all times pertinent to this decision.

3. The plaintiffs on this record were law abiding. No crime was ever shown to have been committed at the "hippie house." In fact, so far as the record shows only one of the twelve plaintiffs was ever shown to have been convicted of crime anywhere. No narcotics were ever found nor anyone smelling like narcotics. No neighbors came to testify about noise disturbance although "complaints from neighbors" were covered in hearsay testimony. The only competent evidence about relationship with neighbors was testimony that the neighbors

were noiser than the "hippies." Several of the plaintiffs who testified displayed a high degree of intelligence, clarity of speech, frankness and sense of relevance. Living or visiting at the "hippie house" or being a "hippie" was not shown to be unlawful and is not understood to be unlawful.

4. Starting shortly before mid-December, 1968, members of the vice squad of the Charlotte City Police and other local law enforcement officers commenced a series of unsolicited visits to the house. According to the testimony there were at least fourteen uninvited visits to the premises in the month covered by the testimony, and additional visits to the street outside, accompanied by accosting of guests or tenants, or by flashing of searchlights on the house, on several other occasions during the same period. Always, there were at least two and usually four or more officers—usually from the vice squad. No warrant was obtained for any visit or any search except the search of December 27, 1968.

5. A summary of the police action is as follows:

*December 13, 1968,* or thereabout: Police officers from the vice squad visited the house, searched the house, searched some of the occupants, searched suitcases and other personal effects. No warrant was displayed. Different officers gave different reasons why the search was made. No crime nor evidence of crime was found.

*December 15, 1968:* Police officers (four or more) from the vice squad came, without a warrant, and searched the house, "frisked" various occupants, took photographs, woke up Joy Kelley and Carlton Tadlock who were asleep, fully clothed, on a mattress on the living room floor. Joy Kelley was sick with 'flu at the time. No evidence of crime was found. Guests in the house were ordered to leave the premises. Arrest of the occupants was threatened. The blue book which contained the house rules was made the subject of some sport by police officers and

was taken from the house by the police. Joy Kelley and Carlton Tadlock were threatened with arrest if they continued to live together in the house without getting married. Kelley was instructed to get a license to run a boarding house. (There was no evidence that food was served or even prepared in the house except that some of the photographs show some open tin cans and a peck-sized plastic bag full of popcorn.')

*December 27, 1968*: Police knocked on the door. This time they had a warrant to search the premises for "narcotic drugs." One of the visitors in the living room went to the door; the doorknob pulled out of the lock in his hand (whether by design or by decrepit nature of the lock is not clear); within ten seconds the police had splintered the door open and were running through the living room without displaying the warrant, headed for the upper reaches of the house searching for narcotics. They also searched the persons of all occupants, tenants and visitors. The visitors were ordered to leave and threatened with arrest if they did not leave. No narcotic drugs nor any use of narcotic drugs was discovered. Joy Kelley demanded to see the warrant but it was not displayed.

*January 5, 1969*: Three policemen in plain clothes came to the house. A metal dummy of a policeman was hanging on the front porch. These officers said that the display of the metal policeman was making other police officers angry. They took it to the police station where it was being kept on the day of trial.

*January 7, 1969*: Police in a car accosted Roberta Shaw walking down the sidewalk away from the house. No particular untoward event occurred on that encounter.

*January 8, 1969*: Officers in uniform visited the house and gave notice to the occupants that if the premises were not "cleaned up" the health department would be called.

*January 8, 1969*: Officers visited the house, entered, and found a girl, said to be a South Carolina runaway wanted by her parents, and took her away.

*January 9, 1969*: Four officers from the vice squad, with some prearranged help from four officers of the county ABC Board, went to the scene on a "routine patrol," waited a couple of minutes in the street outside the house, heard some "profane talk" through a broken window, and then (eight officers in number) entered the house. Eighteen persons were searched and arrested for vagrancy and taken to the police station. Some were photographed. All were thumbprinted. Bonds were set for all of them and they were scheduled for trial next morning before the district criminal court. This was the first occasion, according to Officer Rowland, that he had ever arrested anybody for "vagrancy" while he was inside his own occupied house. Joy Kelley was threatened with arrest if she ever returned to the house. Some physical force was used to suppress those who complained most loudly over the arrest.

*January 10, 1969*: Several of the plaintiffs and the other "vagrancy" defendants were brought up for trial in the district criminal court, and had some discussion with the court and the prosecuting attorney. All defendants were ordered back into custody and within a few minutes thereafter they were ordered released. The technical status of the prosecution was that of "nolle prosequi with leave" which means that the prosecution was suspended but the defendants can be tried under those same warrants at any time the state elects to reopen prosecution under the warrants.

*January 11, 1969*: Police officers, six in number, came to the house, entered uninvited although the lights were on and one of the occupants, a boy of sixteen, was upstairs with a phonograph going. They came upstairs to him, opened some bags and suitcases, telling him they were there by request of

the owner. He was told not to leave his room while they were there. The officers gave conflicting versions to justify this visit.

*January 11, 1969*: Officers accosted Merita Hummel, age twenty, one of those who had been arrested, in the street near the house. She had driven her car to the house and honked her horn for friends inside. Officers accosted her in the street, told her to unload her friends from the car and leave and not come back; if she did return she would be arrested. She left.

*January 12, 1969* (Sunday): Police assisted in serving an eviction notice. The patrol division commander, a veteran of thirty-five years of police work, went in uniform with the owner and real estate agent to the house; found two of the plaintiffs; told them that the landlord wanted his property and he advised them to get out. This he did even though the rent was paid in advance until February 4, 1969! An eviction notice was served in the officer's presence by one of the persons who made that particular visit. The officer said he had never served an eviction notice in thirty-five years as a policeman.

*January 14, 1969*: A formal eviction notice was delivered to the premises by an agent not a police officer.

*January 17, 1969*: Police officers visited premises with an agent for the landowner while notice was delivered demanding immediate possession because of alleged failure to maintain the premises. Threat of arrest if the premises were not vacated by midnight was made. A police officer was present when this visit was made.

*January 17, 1969*: Officers entered the house, and found in it a fifteen-year-old girl who was wanted by her father. They took her from the house and back to the police station. The identity of those present in the house other than the girl in question is not shown.

6. The lone warrant of December 27, 1968 was issued within minutes after the receipt of a telephone call from an anonymous informer previously observed and believed by the police to be "reliable" who, according to Officer Rowland, said that people were selling and consuming marihuana at the "hippie house." Officer Rowland identified Joy Kelley as being the "pusher." However, Joy Kelley's identity as a "pusher" does not add to the "reliable informant" basis for the warrant because her alleged reputation as a dope peddler has its origin in the same "reliable informant." She had no previous record of conviction of any crime. The affidavit signed to support the warrant reads as follows:

"I have reliable information from a reliable informant who has given me reliable information in the past on a number of occasions that states that the occupants of 216 E. Kingston Ave. have marihuana in this house and in their possession and sell these drugs to the general public. This informant states that he has observed large groups of people smoking marihuana and observed people buy and sell marihuana at this address."

Various police officers testified that they were told by various persons found in the house to "come back anytime" or words to that effect. This evidence, if relevant, would not constitute a legal basis for a search.

7. No warning was given at any time as to the civil or constitutional rights of any of the minors who were arrested for "vagrancy."

8. Physical force was used by the police on some occasions. Much of the evidence dealt with this subject and with the "cooperation" or "attitude" of those who were arrested. Police admitted using some force in the course of the January 9, 1969 arrests, and in the course of the booking and incarceration of two of the plaintiffs at the police station. If the searches and arrests were themselves lawful, the force used was not unreasonable nor, apparently, hurtful to anyone.

This is not a "police brutality" case. Nor is the "attitude" or "cooperation" of those arrested or searched a matter of any present significance.

9. The searches, seizures, visits, arrests and threats and "advice" from the police ultimately accomplished the apparent purpose of disbanding the "hippies," emptying the house, restoring it to its owner, and discouraging unconventional speech, assembly, association and conduct by the plaintiffs. It produced no results, so far as the court can determine, in the realm of law enforcement, or prevention or detection of drug usage or other crime.

10. Not since the early days of their police training have the officers of the vice squad had any special instructions on the constitutional requirements for valid searches and search warrants. No instruction has apparently ever been given on the elements of the crime of "vagrancy."

11. As necessary in aid of this order, all findings of fact herein shall be treated as conclusions of law, and all conclusions of law shall be treated as findings of fact; and all supporting evidence not covered in the foregoing brief findings of fact is also relied on in support of the conclusions reached and the order hereafter entered.

## CONCLUSIONS OF LAW

■ The court has jurisdiction under the Civil Rights Act, 42 U.S.C. § 1983, and under 28 U.S.C. § 1343. The plaintiffs have standing to seek the relief sought, as representatives of a class of "lightly employed" persons subject to likelihood of vagrancy prosecution and as individuals still subject to instant vagrancy prosecution either under the original warrants or new warrants. The North Carolina vagrancy statute[1] is vague and broad, and for vagueness and "overbreadth" its constitutionality is attacked in this same proceeding.

Title 28, U.S.C.A., § 2283, the "anti-injunction" statute, says that United States courts "may not grant an injunction to stay proceedings in a State court." This would appear at first blush to eliminate equitable relief. Nevertheless, the statute contains some express exceptions and has been made the subject of many judge-made exceptions, and it is extremely difficult on the present state of the record to say whether § 2283 applies in any given situation and whether a proceedings such as this one under the Civil Rights Act is an exception to the anti-injunction statute. The whole problem has been comprehensively and clearly reviewed in Baines v. City of Danville, 337 F.2d 579 at pages 587 through 595 (4th

1. § 14–336. Persons classed as vagrants. —If any person shall come within any of the following classes, he shall be deemed a vagrant, and shall be fined not exceeding fifty dollars or imprisoned not exceeding thirty days: Provided, however, that this limitation of punishment shall not be binding except in cases of a first offense, and in all other cases such person may be fined or imprisoned, or both, in the discretion of the court:

1. Persons wandering or strolling about in idleness who are able to work and have no property to support them.

2. Persons leading an idle, immoral or profligate life, who have no property to support them and who are able to work and do not work.

3. All persons able to work having no property to support them and who have not some visible and known means of a fair, honest and reputable livelihood.

4. Persons having a fixed abode who have no visible property to support them and who live by stealing or by trading in, bartering for or buying stolen property.

5. Professional gamblers living in idleness.

6. All able-bodied men having no other visible means of support who shall live in idleness upon the wages or earnings of their mother, wife or minor children, except of male children over eighteen years old.

7. Keepers and inmates of bawdyhouses, assignation houses, lewd and disorderly houses, and other places where illegal sexual intercourse is habitually carried on: Provided, that nothing here is intended or shall be construed as abolishing the crime of keeping a bawdyhouse, or lessening the punishment by law for such crime.

Cir., 1964). The statute has been directly interpreted by the Supreme Court of the United States twice, but neither interpretation involved restraint against state criminal prosecutions. See Amalgamated Clothing Workers of America v. Richmond Bros. Co., 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600 (1955) and Leiter Minerals Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957). The confused status of § 2283 is illustrated by Dombrowski v. Pfister, 380 U.S. 479, 484, 499, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) and Cameron v. Johnson, 390 U.S. 611, 613, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968).

■ A correct understanding of the applicability of § 2283 to a particular case is difficult if not impossible to achieve based upon what is *said* about the statute by the courts; it is necessary to look at what the courts *do* with particular fact situations before deciding whether the statute does or does not prohibit injunctive relief in particular cases. It appears that as a necessary part of deciding whether the statute applies, a court is expected to look to and evaluate the state action complained of. If constitutional rights, especially First Amendment rights, are being invaded and state court protection is not believed to be adequate, the statute will not be found to bar injunctive relief. It is therefore necessary for the court to evaluate the alleged state interference with the rights of the plaintiffs before and as a part of a decision whether § 2283 applies. The same considerations apply in determining whether a court, under what is sometimes called the "abstention doctrine," will abstain from taking jurisdiction over the injunctive petition and whether having taken jurisdiction it will refrain from issuing an injunction. It is therefore apparent that in order to decide, first whether § 2283 bars injunction and, second, whether the court should abstain from injunctive relief, it is necessary to analyze on the merits the things that the state is doing to the plaintiffs. If the state action complained of is oppressive enough from a constitutional point of view, this court is expected to consider the case on its merits in spite of § 2283 and the abstention doctrine.

In Dombrowski v. Pfister, *supra*, an injunction against state criminal prosecution was ordered by the Supreme Court, notwithstanding § 2283. The Court also dismissed the abstention doctrine in a sentence which embraces most of the elements which the plaintiffs complain of in the case at bar. The Court said (380 U.S. 479 at 491–492, 85 S.Ct. at 1123):

> "On this view of the 'vagueness' doctrine, it is readily apparent that abstention serves no legitimate purpose where a statute regulating speech is properly attacked on its face, and where, as here, the conduct charged in the indictment is not within the reach of an acceptable limiting construction readily to be anticipated as the result of a single criminal prosecution and is not the sort of 'hard-core' conduct that would obviously be prohibited under any construction."

■■ On this record the court is of the opinion that the anti-injunction statute does not apply; that the court cannot with propriety abstain from considering the case on its merits; and that on the merits plaintiffs are entitled to injunction against further invasion of the constitutional rights of plaintiffs and others similarly situated. The vagrancy statute is properly attacked on its face as being vague and overbroad; it suppresses free expression and free association; no single criminal state court prosecution could conceivably explore and clarify and limit its myriad possible constructions; the conduct of the plaintiffs is not the sort of "hard-core" conduct that would obviously be unlawful under any construction. Moreover, even if the statute is constitutional, this record shows a pattern of misuse (albeit in good faith) of the statute and of search and seizure in a private dwelling—and a course of successful harassment and threats—which surely due process does not allow and apprehension of criminals does not require.

This is not an apology for hippiedom as a way of life, nor is it based even in part on any speculation as to the possible therapeutic effects of a little gutter-wallowing upon growing young people in a pressure-ridden world. Whether the public or the court or the police like or do not approve of "hippies" is totally immaterial. Hippies, like more conventional householders, are entitled to the protection of the constitution, and the court would be remiss if it allowed the length of a man's hair or the thinness of his purse to affect the measure of his civil rights.

Nor is this judgment a reflection on the good faith of the Charlotte police nor on the need for vigorous law enforcement and crime detection. It is, rather, a reminder that the law, like science, grows; that "time makes ancient good uncouth"; and that concern for individual liberty under law may require that measures long thought permissible be abandoned or improved to conform to changed and sharpened constitutional interpretations.

It is, therefore, ordered, adjudged and decreed, that the defendants and their officers, servants and agents and employees, pending further order of this court, be and they are ordered and directed:

1. To refrain from threatening or conducting or procuring the investigation, interrogation, detention, arrest or charge or prosecution of the plaintiffs or any other person under color of North Carolina General Statutes § 14–336, the "vagrancy statute."

2. To refrain from arresting or charging the plaintiffs or other persons or threatening or conspiring to detain, arrest or search the plaintiffs or any other persons without legal probable cause or with any purpose to harass, intimidate or frighten plaintiffs or any other persons without legal probable cause so as to suppress, discourage, defeat, reduce or affect the constitutional rights of the plaintiffs or such persons, including their rights of free speech, peaceable assembly and freedom of association and their rights to be secure in their persons, in their homes and in their possessions, and against unreasonable searches and seizures.

3. To refrain from searching persons or property or seizing property except as incident to lawful arrest or under lawful warrant or when otherwise permitted by the Constitution.

4. To refrain from issuing or obtaining search warrants, or conducting searches under warrants, based only upon affidavits depending on "tips" from anonymous informers, reliable or otherwise, and not supported by affidavit as to other corroborating facts, detail and circumstances showing probable cause to believe the search will reveal evidence of crime.

5. To refrain from prosecution or threatened prosecution of plaintiffs or others except under valid statutes and with probable cause to believe that crime has been committed and that its prosecution will be successful.

6. To return to the attorney for the plaintiffs the metal policeman and any other articles of personal property that may have been taken from the plaintiffs by the defendants at 216 East Kingston Avenue or at the police station.

7. To keep intact and sealed against any view, public or private (except upon order of this court), all records, notations, photographs and other writings dealing with plaintiffs and others who were arrested at 216 East Kingston Avenue on January 9, 1969.

8. To refrain from serving eviction notices, or attending while others serve such notices, execpt when ordered to do so by a court of law.

9. To refrain from ordering guests or tenants in private homes to depart and not return, upon threat of arrest.

A separate order is being entered simultaneously incorporating rulings on numerous motions and collateral matters which were brought up immediately before and during and after the trial.

## ORDER

This case was heard on February 13 and 14, and February 20, 1969, before the undersigned judge without a jury. Findings of fact and conclusions of law on the merits of the petition are stated in a separate memorandum decision. This is a consolidated order dealing with the numerous preliminary skirmishes and motions which took place before the evidence began, and with motions, filed after the hearing, to make additional parties.

1. The Attorney General of North Carolina, pursuant to motion made by telephone on February 6, 1969, and renewed in writing on February 10, 1969, and in person on February 13, 1969, was allowed to intervene and to appear on behalf of the defendants. The written motion, filed February 10, 1969, requested that the Attorney General be allowed to appear as *amicus curiae* and argue certain questions as to jurisdiction and state law. However, no restriction upon the scope of the appearance of the Attorney General was made, and he appeared generally through Mr. Andrew A. Vanore, Jr., Assistant Attorney General, on behalf of the defendants along with counsel for the City of Charlotte and for individual defendants.

2. On the morning the trial began an appearance was made by counsel for the parents of Joy Louise Kelley and Carlton Tadlock, two of the plaintiffs, who made an oral motion to substitute the parents of those two plaintiffs as their next friend in lieu of Mrs. Wheeler. Various assertions were made about the role of the American Civil Liberties Union in the case. The court took the view that the court should be guided by the best interests of the minor plaintiffs rather than by the desires of the parents or the American Civil Liberties Union. Joy Kelley and Carlton Tadlock were called to the stand and their views were sought by the court. Both expressed a desire to have their parents substituted as their personal representatives and both expressed a desire to withdraw from the suit as plaintiffs. However, when asked for the reason they said that fear of police reprisal was their only reason for withdrawal and they both indicated that even if they were allowed to withdraw as plaintiffs they wished to stay and testify on behalf of the other plaintiffs. The court concluded in its discretion that the motion to substitute the parents instead of Mrs. Wheeler as next friend for the plaintiffs Kelley and Tadlock should be denied.

3. An authorization dated January 14, 1969 and signed by all of the plaintiffs authorizing the American Civil Liberties Union to start the suit was introduced in evidence.

4. Motion was made by counsel for the defendants for the court to inquire whether undue or improper influence was used by the Civil Liberties Union or others to prevail on the minor plaintiffs to bring the suit. Since the only evidence of coercion before the court was the testimony by the plaintiffs Tadlock and Kelley of fear of coercion by the *defendants*, the court determined in its discretion that this unusual inquiry would not be made and the motion was denied.

5. Motion was made by the Assistant Attorney General, Mr. Vanore, to dismiss the suit as not being within the jurisdiction of the court. This motion was denied with the qualifying statement, however, that if the case presented the question of the constitutionality of the North Carolina vagrancy statute, that question would have to be passed on later by a three-judge court rather than by an individual judge.

6. Motion was made by the plaintiffs that witnesses who might testify for the defendants should be sequestered so that they could not hear the testimony offered by other witnesses. This motion in the discretion of the court was denied.

7. The plaintiffs on February 10, 1969 amended the complaint. No answer had been filed by the defendants and no objection was made to this amendment

and no objection was in order under the circumstances.

8. The plaintiffs upon motion also deleted from the complaint the last paragraph of "Section IV, Parties Defendant." This had the effect of eliminating John Kilroy as a defendant but plaintiffs' counsel by qualifying statement indicated that the plaintiffs still contended some member of the police department had assaulted the plaintiff Brown or Bowen in the fashion otherwise described in the complaint while he was in an elevator at the police station.

9. Motion of the defendants to dismiss for failure to state a claim upon which relief could be granted was denied.

10. After the hearing was concluded motion was made to allow Gay Dawn Smith and Mary Jean Wagner to intervene as parties plaintiff. The motion is allowed.

11. Motion by the defendants to dismiss after all the evidence was in was denied.

12. After the hearing, motion was made by the plaintiffs to add the Attorney General of North Carolina as a party defendant. This motion is allowed. The Attorney General would appear to be a necessary party only in the determination of the question raised as to the constitutionality of the vagrancy statute, G. S. § 14–336. The Attorney General will be served with process and a copy of the complaint and copies of all pleadings, motions and orders in this cause.

13. Preliminary injunction was entered as appears of record. Counsel for all parties are directed to show cause on or before the 24th day of March, 1969, if any cause exists, why the hearing which has been conducted should not be treated as a trial on the merits and why the preliminary injunction should not be treated as a permanent injunction from March 24, 1969 and thereafter. Under Federal Rule 65, the testimony which has already been taken would not ordinarily be repeated at a trial on the merits. The court is not attempting by this order to prevent the parties from offering and introducing any additional evidence which they find to be proper. However, unless showing is made in writing on or before March 24, 1969, that some party has and desires to introduce additional material testimony, the court does not contemplate the further taking of oral testimony and the preliminary injunction will become a permanent injunction as of March 24, 1969.

14. With particular reference to the question of the constitutionality of G.S. § 14–336, the North Carolina vagrancy statute, the following orders are made:

(a) The Attorney General is directed to advise the court on or before March 24, 1969 whether any cause exists why the constitutionality of the statute should not be presented to a three-judge court and passed upon by that court upon the basis of the testimony to date and the pleadings, motions and affidavits which already appear in the file, supplemented by any further pleadings, motions or affidavits which the Attorney General or any other parties may file before the three-judge court convenes.

(b) Unless good cause to the contrary has been shown, the court will, immediately after March 24, 1969, request the Chief Judge of the Fourth Circuit Court of Appeals to designate a three-judge court to hear argument and pass upon the constitutionality of G.S. 14–336, the North Carolina vagrancy statute.

15. Any parties desiring to take exception to this order or any part hereof may file appropriate exceptions and objections at any time up to and including March 24, 1969.

16. The costs will be paid by the City of Charlotte.