[No. 42854. En Banc. August 15, 1974.]

ALLAN B. MONROE *et al., Petitioners,* v. GEORGE P. TIELSCH, *Respondent.*

*Larry V. Lund* of *Seattle-King County Public Defender,* for petitioners.

*A. L. Newbould, Corporation Counsel,* and *J. Roger Nowell, Assistant,* for respondent.

BRACHTENBACH, J.—The petitioners, aged 10, 14, 14 and 16, moved to expunge all of their "arrest records held by the Seattle Police Department, the King County Juvenile Court's intake records, social files and legal files."

The event which precipitated petitioners' motion was a petition alleging each to be delinquent for having committed the offense of indecent liberties in violation of RCW 9.79.080. One of the petitioners was charged also with assault and another also with shoplifting, possession of a dangerous weapon and burglary.

At the hearing on the indecent liberties charge, the alleged victim, with the acquiescence of her father, declined to testify. The charges were dismissed.

The petition to expunge was aimed at not only the indecent liberties charges but other records as indicated above. The motion was denied.

With regard to the dissemination of arrest records to prospective employers, Justice Finley's concurring opinion reflects exhaustive research and analysis. Rather than extending this opinion by parallel approach, we adopt that portion of his concurring opinion and its holding that a juvenile's arrest record may not be released under any circumstances to prospective employers or nonrehabilitative educational institutions.

Complete expunction of petitioners' arrest records, juvenile court files and what they have categorized as social and legal files, however, would be contrary to the underlying philosophy of our juvenile law. The purpose of our juvenile court law, RCW 13.04, has been protection, guidance and rehabilitation, not punishment. "Its operation is intended to check the criminal tendency in its inception, and protect the unformed character in the facile period from improper environment and influences." *In re Lundy,* 82 Wash. 148, 151, 143 P. 885 (1914).

In implementing that philosophy and purpose the statute provides for probation counselors to assist the juvenile court. The law directs the counselor to "inquire into the antecedents, character, family history, environments and

cause of dependency or delinquency of every alleged dependent or delinquent child brought before the juvenile court . . ." RCW 13.04.040. In short, the judge, facing one of the most difficult tasks in the judicial system, needs all the help and information possible to reach a decision as to how to best correct and aid the juvenile before him. Obviously that decision may be a literal turning point in the young offender's life.

One of the facts which the court should have available is the prior involvement of the juvenile with alleged acts of violation of the law. That proof comes from the arrest record. The facts of this case demonstrate the absurdity of expungement. Let us assume that one of these particular petitioners is later before juvenile court and his arrest records have been expunged. The court would be unaware that one of these petitioners had been arrested in a period of 17 months for robbery, vandalism, shoplifting, rape, assault, larceny, burglary, carrying a concealed weapon and curfew violation. We have lost not only our senses, but our touch with reality if we think such a record would not have a valid bearing on the judge's decision as to how to treat the offender. With that record the court could inquire into the circumstances of each arrest and its disposition. Without it the court is denied information which could have a substantial influence on its effort—not to punish, but to aid and rehabilitate the offender. The compelling interest of the State in the availability of arrest records of juveniles is perfectly obvious.

This court has held specifically that arrest records are admissible in a hearing to determine whether to try a juvenile as an adult. *Sheppard v. Rhay*, 73 Wn.2d 734, 440 P.2d 422 (1968); *Williams v. Rhay*, 73 Wn.2d 770, 440 P.2d 427 (1968).

Throughout our juvenile court act there is vested a large measure of discretion in the juvenile court to take appropriate steps at appropriate times to protect an arrested juvenile from the public exposure of his arrest as well as the disposition thereof. In the name of privacy, that discre-

tion should not be subject to disturbance absent an abuse thereof.

Law enforcement agencies have a legitimate interest in juvenile arrest records. In 1972, 25.6 percent of all arrests reported by the Federal Bureau of Investigation were of persons under the age of 18 years. U.S. Dep't of Justice, *Crime in the United States* Table 32, at 126 (1972). Traditionally law enforcement has an interest in more than making a juvenile arrest and then thrusting that juvenile into the court system. The same FBI report, Table 21, discloses that in 1972, 45 percent of all juvenile offenders taken into custody were handled within the department and released, obviously by an informal disposition. Thus in dealing with juveniles who are frequently as mobile as any other part of our society, law enforcement officials should have the assistance of the past involvement of the juvenile with offenses as reflected by arrests.

If, as petitioners contend, juveniles are entitled to an automatic expunction of their arrest records, it is obvious that neither law enforcement nor the juvenile court would ever have a true picture of the developing pattern of any juvenile. If each arrest is expunged, no record will ever be developed and all of those interested in the guidance and rehabilitation of the juvenile would be without the means to properly evaluate the conduct of the juvenile when he or she is next back within the system.

For the foregoing reasons, the trial court is affirmed.

HALE, C.J., and HUNTER, HAMILTON, STAFFORD, and WRIGHT, JJ., concur.

FINLEY, J. (concurring in part and dissenting in part)— On July 26, 1972, petitions were filed in the Juvenile Department of the Superior Court for King County alleging that petitioners were delinquent per RCW 13.04.010, and had committed the criminal offense of indecent liberties as defined by RCW 9.79.080, on June 26, 1972. At a subsequent fact-finding hearing on September 21, 1972, the prosecuting

witness, with the acquiescence of her father, declined to testify. The presiding Juvenile Court judge then dismissed the charges with prejudice.

At the fact-finding hearing, the petitioners moved to expunge all records relative to the incident of June 26, 1972. This motion was continued and later broadened to encompass the expunction of police arrest records, juvenile department social files and legal files pertaining to *all* of petitioners' arrests on suspicion of having committed various criminal offenses. The motion to expunge all pertinent records was considered by the Juvenile Court on April 27, 1973, and denied. Petitioners sought review of this ruling by writ of certiorari which was granted to consider the merits of the questions presented therein.

The record reveals that, including the incident of June 26, 1972, petitioners, Allan Bernard Monroe, aged 10, Alonzo Monroe, Jr., aged 14, Clarence Webb, Jr., aged 14, and Mathion Powell, Jr., aged 16, had been arrested on 1, 5, 6, and 13 occasions respectively. Petitioners alleged that maintenance and dissemination of their records of arrest will stigmatize them as "arrestees." It is asserted that many of the same disabilities which attach to one who is convicted of a criminal offense also attach to one who is merely arrested upon suspicion of criminal misconduct. The existence of these records, it is urged, constitutes an invasion of their constitutional right of privacy, and will work to deny the petitioners substantial educational and vocational opportunities merely because of their arrestee status. The petitioners by their motion to expunge are seeking to alleviate or avoid the discrimination and prejudice which essentially results from their arrestee but nonconvicted record status.

Respondent, Chief of Police Tielsch, argues that there is no statutory provision for the expunction of arrest records, and further, article 6, section 6 of the Seattle City Charter requires that, "[t]he chief of police shall keep a correct record of all arrests, showing the time and cause of complaint upon which each arrest was made . . ." The re-

spondent asserts that arrest records provide a valuable tool as a predictive factor in determining the probability of future antisocial behavior. The identification components of an arrest record, consisting primarily of photographs and fingerprints, are said to be of inestimable value in the identification and apprehension of criminals. In oral argument, *respondent* urged that identification information is so highly essential to law enforcement operations that expurgation should not be granted *regardless of the circumstances* of arrest.[1]

### DISSEMINATION OF ARREST RECORDS TO PROSPECTIVE EMPLOYERS

*Petitioners,* however, offer persuasive evidence that misuse of arrest records by nonlaw enforcement personnel can seriously hamper or endanger the employment and educational opportunities of the arrestee. It appears that an arrest record in the world of commerce, as a practical matter, transmutes the legal presumption of innocence into one of guilt.[2] The stigmatization as an arrestee, petitioners contend, automatically closes the door to many job opportunities otherwise available to the nonarrested applicant.

There is abundant evidence that the nonconvicted arrestee is subjected to substantial discriminatory sanctions in the job marketplace. In a survey of prospective employers, 64 percent would refuse to consider an employment candi-

---

[1] *Cf.* RCW 13.04.130 which provides:

"Neither the fingerprints nor a photograph shall be taken of any child under the age of eighteen years taken into custody for any purpose without the consent of juvenile court."

[2] "The civilized world generally acknowledges presumption of innocence as a human right. Yet, the United States affords this right less protection than countries abroad; indeed, in the United States, protection of this human right is inferior at times to that in communist countries. This lack of protection, coupled with widespread abuse in making arrests, suggests the United States needs a thorough revision of its handling of arrest records. Such a reform is especially important because in the United States a significant part of the population has arrest records that did not lead to a conviction and finds it difficult to obtain employment, especially if unskilled and untrained." Hess & Poole, *Abuse of the Record of Arrest Not Leading to Conviction,* 13 Crime & Delinquency 494, 501-02 (1967).

date with an arrest record. Schwartz & Skolnick, *Two Studies of Legal Stigma*, 10 Social Prob. 133 (1962). A survey of New York employment agencies revealed that 75 percent would not accept for referral an applicant with an arrest record. *Menard v. Mitchell*, 430 F.2d 486, 490 n.17 (D.C. Cir. 1970), *dismissed in part*, 328 F. Supp. 718 (D.D.C. 1971). Many employers have a flat policy against hiring an arrestee applicant. *See* Hess & Poole, *supra* at 496. Several of the panoply of disabilities that may attach to the arrestee applicant in the job market are discussed in *Report of the Committee to Investigate the Effect of Police Arrest Records on Employment Opportunities in the District of Columbia* 10-20 (C. Duncan, Chmn. 1967) (hereinafter *Duncan Report*). Whether the potential employer assumes the arrested individuals to be of a disreputable nature or merely wishes to eliminate the inconvenience and expense of inquiry into the circumstance of arrest is immaterial—the applicant is barred from employment. Hiring sanctions against the arrested individual do not exist solely in the private sector, but are also in evidence in some governmental agencies, despite policies to the contrary. *See* Comment, *The Arrest Record and New York City Public Hiring: An Evaluation*, 9 Colum. J.L. & Social Prob. 442, 469-94 (1973); *Duncan Report, supra* at 10-20. Furthermore, there is evidence that a similar stigmatization may take place within the education system. Schafer & Polk, *Delinquency and the Schools* in the *President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime* 222 (1967). Thus, the arrested juvenile, in many instances, may be barred from educational or occupational opportunities irrespective of his guilt or innocence of any misdeed.

Were there a substantial correlation between the factor of arrest and future job performance, the interests of the employer in such information arguably might override the possibility of misuse of the record. There is, however, little evidence that the arrestee is a worse risk than his nonar-

rested counterpart. The 11-year performance records of 1,915 arrested and nonarrested New York City police officers were evaluated by the New York City Rand Institute. The survey revealed that a prior arrest had no demonstrable bearing upon later job performance. Indeed, in at least one category, the police officers with prior arrest records surpassed their brethren without an arrest experience. *See* Comment 9 Colum. J.L. & Social Prob., *supra* at 462-63. In another study of public employees wherein the criteria were: punctuality, attendance, honesty, judgment, initiative, cooperativeness, accuracy and industriousness, no difference was found between the performances of arrested and nonarrested civil servants. H. Miller, *The Closed Door: The Effect of a Criminal Record on Employment with State and Local Public Agencies* 95-99 (1972). Accordingly, a record of prior arrests is of doubtful validity as a predictive index of probable job performance.[3]

The plight of arrested nonconvicted youthful offenders is of no small consequence in our society. The probability that the average American male child will be arrested before the age of 18 exceeds 25 percent, and for the female child the probability is slightly under 7 percent (based upon 1965 arrest probabilities). Christensen, *Projected Percentage of U.S. Population with Criminal Arrest and Conviction Records* in the *President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Science and Technology* 216, 222 (1967). Due to complex sociological reasons, some minorities may experience a significantly higher incidence of arrest.[4] *See Duncan Report, supra* at 7-9; *President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free*

---

[3]*The President's Commission on Crime in the District of Columbia* 454 (1966), has suggested that the recommendations of prior employers are not only a more reliable source, but also a more accurate source, of information regarding a prospective employee.

[4]Exclusion from employment based solely upon a prior arrest record may violate the applicant's civil rights. *Gregory v. Litton Systems, Inc.*, 316 F. Supp. 401, 403 (C.D. Cal. 1970), *aff'd*, 472 F.2d 631 (9th Cir. 1972).

*Society* 75 (1967); *Report of the President's Commission on Crime in the District of Columbia* 494-510 (Appendix 1966); Note, *Discrimination on the Basis of Arrest Records,* 56 Cornell L. Rev. 470 (1971). Hence, the personal economic havoc that may be wrought by misuse or misinterpretation of arrest records may affect a significant portion of the populace.

The happenstance of arrest is a singularly inappropriate occurrence for society to attach a stigma that may seriously handicap the juvenile as he matures into adulthood. The decision to arrest is often an instantaneous judgment made by one man, the arresting officer, based upon whatever information is at his disposal. In some instances, arrests are a product of mistaken identify, *cf. Menard v. Mitchell,* 328 F. Supp. 718 (D.D.C. 1971); the illegal result of the arrestee's valid exercise of First Amendment freedoms, *see Irani v. District of Columbia,* 272 A.2d 849 (D.C. App. 1971); *Henry v. Looney,* 65 Misc. 2d 759, 317 N.Y.S.2d 848 (1971); or the result of police harrassment, *see Hughes v. Rizzo,* 282 F. Supp. 881 (E.D. Pa. 1968); *Wheeler v. Goodman,* 298 F. Supp. 935 (W.D.N.C. 1969); *United States v. McLeod,* 385 F.2d 734 (5th Cir. 1967). At the time of arrest the police cannot, consistent with sound law enforcement, be expected to meet some degree of certainty above what is now designated as "probable cause." By the same token, society and the system of criminal justice should not brand a youth for life with the opprobrium associated with the arrestee status merely because the constable has blundered.

The theory underlying our system of juvenile courts is based upon the premise that through contact with the system the juvenile will benefit. *See generally* Pound, *The Juvenile Court and the Law* reprinted in 10 *Crime & Delinquency* 490 (1964). This salutary goal cannot be accomplished if the arrest mechanism seriously impedes the occupational or educational opportunities of the youth that are to be served by the juvenile justice system.

Misuse or misinterpretation of arrest records by prospective employers is a needless detractor from the concep-

tually protective nature of the juvenile courts. While the jurisdiction involved in the instant case will not release arrest information without a waiver by the arrestee, such protections are meaningless when waiver is a condition precedent to employment. Hess & Poole, *Abuse of the Record of Arrest Not Leading to Conviction,* 13 Crime & Delinquency 494, 495 (1967). The reports and literature are legion with examples of the harmful complications that may flow from an erroneous arrest. *See, e.g.,* Gough, *The Expungement of Adjudication Records of Juvenile and Adult Offenders: A Problem of Status,* 1966 Wash. U. L.Q. 147. A poignant example of the mischief that may be caused by the misuse of juvenile arrest records was the basis of a successful defamation and invasion of privacy action in *Brink v. Griffith,* 65 Wn.2d 253, 396 P.2d 793 (1964). In that case, the prior, relatively ancient, juvenile arrest record of the plaintiff had been used by the town mayor as justification to support his summary dismissal of the plaintiff from employment as the chief of police. Unfortunately, the discrimination worked against prospective job applicants is rarely so candid as to illuminate arrestee status as the basis for rejection. *But cf. Gregory v. Litton Systems, Inc.,* 316 F. Supp. 401, 403 (C.D. Cal. 1970), *aff'd,* 472 F.2d 631 (9th Cir. 1972).

The foregoing seems to me most convincing support for a conclusion that the serious consequences precipitated by the too ready availability of arrest information to prospective employers far outweighs whatever supposed predictive function as to employment it theoretically may be thought to serve. I note that the overwhelming consensus of authorities has reached a like conclusion. *See, e.g., Duncan Report, supra* at 23; *Recommendations of the President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime* 38-40 (1967); *The Challenge of Crime in a Free Society, supra* at 87-88; H. Miller, *supra* at 18; Hess & Poole, *supra* at 502-05; Gough, *supra* at 168-74; Comment, 9 Colum. J.L. & Social Prob., *supra, passim;* Comment,

*Branded: Arrest Records of the Unconvicted*, 44 Miss. L.J. 928 (1973); Comment, *Removing the Stigma of Arrest: The Courts, The Legislatures and Unconvicted Arrestees*, 47 Wash. L. Rev. 659, *passim* (1972); Note, *Retention and Dissemination of Arrest Records: Judicial Response*, 38 U. Chi. L. Rev. 850, 861-74 (1971); Note, 56 Cornell L. Rev., *supra* at 478-81; Note, *Juvenile Delinquents: The Police, State Courts, and Individualized Justice*, 79 Harv. L. Rev. 775, 784, 799-801 (1966); Note, 6 Harv. Civ. Rights-Civ. Liv. L. Rev. 165, 172 (1971).

In accordance with the principles of fundamental fairness implicit in our institutions of juvenile justice, it is my best judgment that information relating to arrests not leading to the conviction of a juvenile may not be released under any circumstances to prospective employers or nonrehabilitative educational institutions.[5] Furthermore, in this regard, petitioners are entitled to appropriate protective judicial relief.

### RETENTION OF ARREST RECORDS BY LAW ENFORCEMENT AGENCIES

Petitioners in the case at bar seek not only to protect their records from disclosure to prospective employers, but also the return or expunction of all arrest-related police,

---

[5] The confidentiality of arrest records maintained by the State Bureau of Criminal Identification is mandated by RCW 72.50.140. Violation of this statute gives rise to an action for damages, including damage to reputation under RCW 72.50.170.

It is not within the power of this court to mandate the removal from job applications of questions by private employers relating to prior arrest records of employment applicants. *But cf.* Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.; Gregory v. Litton Systems, Inc.*, 316 F. Supp. 401 (C.D. Cal. 1970), *aff'd,* 472 F.2d 631 (9th Cir. 1972). The result reached here will, however, stay the hand of the State from being a party to that discrimination by releasing such information or making inquiries of this nature. *See* H. Miller, *supra, "State Juvenile Policy versus Application by State and Subordinate Jurisdictions"* at 31.

It should be noted that the United States is one of the few countries where records of arrest are included in a so-called criminal record, and of 39 countries and Interpol surveyed, none released arrest information to prospective employers. *See* Hess & Poole, *supra* at 499-503.

juvenile and social files. The question of the return or expunction of arrest records has spurred a flurry of litigation in recent years. *See, e.g., Eddy v. Moore,* 5 Wn. App. 334, 487 P.2d 211 (1971); *Menard v. Mitchell,* 328 F. Supp. 718 (D.D.C. 1971); *Spock v. District of Columbia,* 283 A.2d 14 (D.C. App. 1971); *Morrow v. District of Columbia,* 417 F.2d 728 (D.C. Cir. 1969); *United States v. Kalish,* 271 F. Supp. 968 (D.P.R. 1967); Annot. 46 A.L.R.3d 900 (1972). Examination of modern cases reveals a clear trend of contemporary authority supporting the expunction or return of arrest records in instances where arrest has not led to conviction. The basic issue, actually, is not a new or novel one. While the instant case involves juvenile arrest records, the courts for many years have traditionally granted appropriate relief to *adult arrestees. See, e.g., Schulman v. Whitaker,* 117 La. 704, 42 So. 227 (1906); *Itzkovitch v. Whitaker,* 117 La. 708, 42 So. 228 (1906); *McGovern v. Van Riper,* 137 N.J. Eq. 24, 43 A.2d 514 (Ct. Ch. 1945). *Cf. Mabry v. Kettering,* 89 Ark. 551, 117 S.W. 746 (1909); *Downs v. Swann,* 111 Md. 53, 73 A. 653 (1909); *State ex rel. Reed v. Harris,* 348 Mo. 426, 153 S.W.2d 834 (1941); *Cissell v. Brostron,* 395 S.W.2d 322 (Mo. Ct. App. 1965); *Bartletta v. McFeeley,* 109 N.J. Eq. 241, 156 A. 658 (Ct. Err. & App. 1931).

There is, of course, statutory authority in many jurisdictions which provides for either automatic expunction or sealing of arrest records, or a procedure by which the arrestee may petition for expunction or return of records. *See* summaries of statutes in H. Miller, *supra* at 234-50. *See also* Gough, *supra* at 150-86; Jacobs, *Erasure of Criminal Arrest Records: The Connecticut Statute,* 47 Conn. B.J. 2 (1973); Comment, 1971 Utah L. Rev. 381, 386 n.27. In most countries of the civilized world, there is no need for expunction statutes as criminal records include only records of conviction. Hess & Poole, *supra* at 500-01.

The laws of Washington include several provisions which alleviate the need for expunction under varying circumstances. In Washington, the fingerprints and photograph of

a minor in custody may not be taken without consent of the juvenile court. RCW 13.04.130. Petitioners seek expungement of social records maintained by the probation officer. RCW 13.04.230 provides that destruction of these records may be had at the discretion of the court. Further, RCW 13.04.250 allows the selective destruction of records of youths who have been committed to the care of the Department of Institutions upon their reaching majority. In addition, this court has ordered the removal of all penalties and disabilities attendant to a plea of guilty upon fulfillment of probation requirements pursuant to RCW 9.95.240. *Matsen v. Kaiser*, 74 Wn.2d 231, 443 P.2d 843 (1968). The piecemeal framework of Washington statutory enactments does not, however, provide a comprehensive system for the sealing or expunction of juvenile arrest records.

The fact of arrest is probative of nothing. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 1 L. Ed. 2d 796, 77 S. Ct. 752 (1957). Nonetheless, I have discussed at some length the intrusions made into the private lives of job applicants caused by the divulgence of arrest records. There seems to be something drastically wrong with a societal attitude which imposes or precipitates social and economic sanctions upon an individual as the cost of social penitence and forgiveness when the subject is innocent of any conclusively ascertained and established social misconduct.

The fundamental nature of the right of privacy was given expression by the United States Supreme Court in *Boyd v. United States*, 116 U.S. 616, 630, 29 L. Ed. 746, 6 S. Ct. 524 (1886):

> The principles laid down in this opinion [by Lord Camden in *Entick v. Carrington*, 19 How. St. Tr. 1020] affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that consti-

tutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence, —it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other.

The right to be free from officious intermeddling in one's personal affairs as a concept of tort law was originally proposed in a landmark article by Sammuel Warren and Louis Brandeis in *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890). By the time of its intellectual sequel by William Prosser in *Privacy*, 48 Cal. L. Rev. 383 (1960), the right of privacy had become an established principle of American civil jurisprudence.[6] *See Brink v. Griffith*, 65 Wn.2d 253, 396 P.2d 793 (1964). *See also* A. Miller, *The Assault on Privacy* 169-238 (1971).

The expanding right of privacy was recognized as a basic tenet of the Bill of Rights in *Griswold v. Connecticut*, 381 U.S. 479, 484, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965).

---

[6]Through its enactments, the Washington State Legislature has, in many areas, zealously guarded the individual's right to privacy. Intercepting, recording or divulging personal written or electronic communications is a criminal violation of RCW 9.73, and also gives rise to a civil action for damages. RCW 26.12.080 permits a judge in family court to close any part of the public files to protect the privacy of the individuals. Similar protections are proscribed for guarding the privacy of individuals in mental illness hearings. RCW 71.02.160 and RCW 71.06.170. The powers of the executive branch to establish a state data communications and processing system must include adequate safeguards to protect the privacy of the citizenry, RCW 43.105.040. One who submits himself to the care and treatment of our state's alcohol and drug rehabilitation centers need not fear that his record of treatment will be brought forth to haunt him, RCW 69.54.070, .080. Further the State Bureau of Identification is required by RCW 72.50.140 to maintain strict confidentiality of the records in its keeping.

specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. See *Poe* v. *Ullman,* 367 U. S. 497, 516-522 (dissenting opinion). Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one, as we have seen. The Third Amendment in its prohibition against the quartering of soldiers "in any house" in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

*Griswold* clearly established that the intimacies of the marriage relationship were within the protected zone of privacy. The court soon recognized that the possession of obscene material within the privacy of one's home was equally protected. *Stanley* v. *Georgia,* 394 U.S. 557, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969). The marital privacy protected in *Griswold* was extended equally to unmarried individuals in *Eisenstadt v. Baird,* 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972). In *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973), the court held that a woman's right to privacy extended to encompass her right to terminate an unwanted pregnancy. *See generally* Note, 1973 Duke L.J. 1037. Perhaps the most apt characterization of the constitutional right to privacy was succinctly expressed by Mr. Justice Brandeis' dissent in *Olmstead v. United States,* 277 U.S. 438, 478, 72 L. Ed. 944, 48 S. Ct. 564, 66 A.L.R. 376 (1928):

The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. . . . They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. *They con-*

*ferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment.*

(Italics ours). This court has recently affirmed the right of privacy as an implicit emanation of the Bill of Rights, but not an absolute when outweighed by the equally fundamental right of the people to be informed of the financial relationships of their elected representatives. *Fritz v. Gorton,* 83 Wn.2d 275, 517 P.2d 911 (1974). Additionally, we have reaffirmed the right of the individual to maintain the privacy of his associational memberships. *Young Americans for Freedom, Inc. v. Gorton,* 83 Wn.2d 728, 522 P.2d 189 (1974).

The record of one's arrest may continue to subject the arrestee to a variety of unofficial sanctions. As stated by Judge Bazelon in *Menard v. Mitchell,* 430 F.2d 486, 490-91 (D.C. Cir. 1970), *dismissed in part,* 328 F. Supp. 718 (D.D.C. 1971), *aff'd sub nom, Menard v. Saxbe,* 498 F.2d 1017 (D.C. Cir. 1974):

> An arrest record may be used by the police in determining whether subsequently to arrest the individual concerned, or whether to exercise their discretion to bring formal charges against an individual already arrested. Arrest records have been used in deciding whether to allow a defendant to present his story without impeachment by prior convictions, and as a basis for denying release prior to trial or an appeal; or they may be considered by a judge in determining the sentence to be given a convicted offender.

(Footnotes omitted). *See also Davidson v. Dill,* 180 Colo. 123, 503 P.2d 157 (1972). The unenviable record of 25 arrests upon various charges of "suspicion" collectively amassed by the four petitioners herein do not create an inference of guilt within our system of criminal justice.

The retention of criminal arrest records of a noncon-

victed arrestee was recently considered by the Court of Appeals in *Eddy v. Moore*, 5 Wn. App. 334, 487 P.2d 211, *review denied*, 79 Wn.2d 1012 (1971). In that case, the appellant successfully maintained that police retention of her fingerprints and photograph violated her constitutional right of privacy. In a scholarly opinion, the *Eddy* court traced the long evolution of the equitable right of privacy as a constitutional doctrine and acknowledged its application to the retention of fingerprints and photographs by the police. Thus the Court of Appeals in *Eddy* held that such retention impermissibly violated the appellant's fundamental right to privacy. Therefore, absent a showing of a compelling interest in these documents on the part of the State, Mrs. Eddy was entitled to their return.

In *Menard v. Mitchell*, 328 F. Supp. 718 (D.D.C. 1971), Judge Gesell applied the compelling interest test in an action to expunge records forwarded to the FBI by California authorities. The federal court in *Menard* found itself without jurisdiction to order expunction of FBI records of a state arrest, but it was able to rule that the plaintiff's identification files may be released solely to authorized law enforcement agencies, and not to prospective employers.

In its second consideration of the *Menard* case, the United States Court of Appeals ordered the FBI to remove Menard's fingerprints from its criminal identification files. *Menard v. Saxbe*, 498 F.2d 1017 (D.C. Cir. 1974). In so doing the court noted, at 1025, that the expunction of such records is not the responsibility of the FBI's National Crime Information Center (NCIC) or the federal courts, but rests with the law enforcement agency that submitted the original data. Thus, the *Menard* court reasoned that it was the province of the state courts to order expunction by local law enforcement agencies with concomitant retrieval from the NCIC system. The principles announced in the prior *Menard* opinions at 430 F.2d 486 and 328 F. Supp. 718 have been resolutely affirmed and reaffirmed by the federal courts. *See, e.g., Sullivan v. Murphy*, 478 F.2d 938 (D.C.

Cir.), *cert. denied,* 414 U.S. 880, 38 L. Ed. 2d 125, 94 S. Ct. 162 (1973); *Bilick v. Dudley,* 356 F. Supp. 945 (S.D.N.Y. 1973); *Lykken v. Vavreck,* 366 F. Supp. 585 (D. Minn. 1973).

In an action to expunge a nonconvicted arrestee's police record, the Colorado Supreme Court has recently held that the application of the compelling interest test is necessarily applicable to properly balance the competing interests of the individual against those of society. Relying heavily upon the decision of the Washington Court of Appeals in *Eddy v. Moore, supra,* the Colorado court held the arrestee's right to privacy to be paramount to any demonstrated societal interest. *Davidson v. Dill,* 180 Colo. 123, 503 P.2d 157 (1972), noted, 35 U. Pitt. L. Rev. 205 (1973).

The United States Supreme Court has acknowledged that the right of privacy extends only to fundamental rights "implicit in the concept of ordered liberty." *Roe v. Wade, supra* at 152. *See also Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 37 L. Ed. 2d 446, 93 S. Ct. 2628 (1973). As noted by Judge Bazelon in *Menard v. Mitchell,* 430 F.2d 486, 490-91 (D.C. Cir. 1970), *dismissed in part* 328 F. Supp. 718 (D.D.C. 1971) (quoted, *supra*), police maintenance of the arrest records of multitudes of presumably innocent juveniles may well lead to continuing official and unofficial sanctions, solely because of their arrestee status. *See* Hess & Poole, *supra.* It cannot be gainsaid that the fundamental right of the individual to be secure from invidious societal deprivations caused by unwarranted intrusions into his personal life is no less deserving of the higher standard of rigid judicial scrutiny. *See* Countryman, *The Diminishing Right of Privacy: The Personal Dossier and the Computer,* 49 Tex. L. Rev. 837 (1971); Comment, *Police Records of Arrests: A Brief for the Right to Remove Them from Police Files,* 17 St. Louis L.J. 263 (1972); Note, *Maintenance and Dissemination of Records of Arrest Versus the Right to Privacy,* 17 Wayne L. Rev. 995 (1971).

The foregoing analysis amply demonstrates the degree to which the individual's right of privacy may be infringed by

police retention of juvenile arrest records. Potential invasions of privacy by law enforcement officials stems primarily from their retention of the arrestee's name and address. In contradistinction, "criminal identification information,"[7] which may be used to detect possible subsequent criminal behavior does not present the same potential for abuse. *But see Eddy v. Moore*, 5 Wn. App. 334, 487 P.2d 211 (1971). Expunction of police records of arrestees' names and addresses substantially precludes the possibility of police harassment of an individual based solely upon a former arrest. In my opinion, and consonant with the fundamental right of privacy, the state should be required to demonstrate a *compelling interest* in retention of components of the arrest record that include petitioners' names and addresses, or other similar information, which may lead the police from the arrest file to the juvenile.[8] *See Eddy v. Moore, supra; Menard v. Mitchell,* 328 F. Supp. 718 (D.D.C. 1971).

Conversely, the cataloging by trait or characteristic of criminal identification information precludes, for the most part, any invasion of privacy by police misuse of such data.[9]

---

[7] By the term "criminal identification information" I refer to those components of the record of arrest such as fingerprints, photographs or *modus operandi* files which are indexed by the identifying trait or characteristic and *not* by the arrestee's name and address. Of course, the name and address of the individual are a part of each criminal identification file, but access to the name and address is had only by its connection with the indexed trait or characteristic.

[8] I do not consider the requirements of article 6, section 6 of the Seattle City Charter to mandate anything more of the respondent chief of police than to keep accurate arrest records for statistical purposes. That requirement does not necessarily include the arrestee's identification.

[9] I am acutely aware of the commonly expressed fears of the creation of an Orwellian society in which a "Big Brother" computer digests for possible retrieval bits of information concerning every aspect of our daily lives. I share some of those fears, but this is an aspect of privacy not presented in the instant case. If the storing of criminal identification information is socially undesirable, it is a problem for the legislature. *Cf.* Senate Bill 3094 (1st Ex. Sess. (1974)). *See also California Bankers Ass'n v. Shultz,* 42 U.S.L.W. 4481 (U.S. Apr. 1, 1974); Countryman, *The Diminishing Right of Privacy: The Personal Dossier and the Computer,* 49 Tex. L. Rev. 837 (1971).

Therefore, in my opinion, the state need only demonstrate a legitimate state interest in the retention of criminal identification information which, from its connection with a criminal act, may lead the police *from the crime to its perpetrator*. It may well be, in the instant case, that the state may be able to demonstrate its interests in the retention of all or a portion of the subject police arrest records. This involves a balancing of interests which I would leave in the *sound discretion of the juvenile court* to determine whether the state has shown (1) a compelling interest in the juvenile arrestees' names and addresses, and/or (2) a legitimate interest in the retention of criminal identification information relating to petitioners.

The purpose of expunction of all or a portion of a juvenile's arrest record is to safeguard the individual's right of privacy from possible police intrusions. Juvenile court records and social files do not present the same potential for abuse. Indeed, those records may serve as a valuable source of background information should the arrested juvenile ever again appear before the juvenile court. In the event of future proceedings involving the subject juvenile, having such information at its disposal may enable the court to make a more informed and reasoned disposition of the matter before it. I would conclude that the maintenance of juvenile court records and social files is in keeping with the conceptually protective role of the juvenile justice system.

It seems to me there is nothing strangely novel or unusual about my suggested disposition of this case, which only acknowledges the minimal constitutional protections which must be accorded the individual's right of privacy. Further safeguards against the misuse of arrest records are a topic for state and federal legislation and regulation. In recognition that the current criminal information network may be "out of effective control," the United States Department of Justice has taken an official position upon arrest records which far surpasses the modest constitutional protections afforded by my approach. *See Proposed Regs. for Criminal*

*Justice Systems*, 39 Fed. Reg. 5636 (1974). Under proposed regulations the FBI and state authorities would be required to seal *all* arrest records that do not result in a conviction or other disposition adverse to the individual. *Proposed Regs. for Criminal Justice Systems* § 20.22(b), *supra* at 5637. Moreover, upon adoption of the regulations, individuals will be allowed access to state and federal records to ensure their accuracy and completeness. *Proposed Regs. for Criminal Justice Systems* § 20.22(d), *supra* at 5637. In addition, the state legislature is currently considering a bill which would establish a comprehensive system of procedural safeguards which would include the automatic expunction of juvenile and adult arrest records after a period of 120 days. The proposed act would bar nonlaw enforcement dissemination of all arrest records, while records of conviction would be open to public inspection. *See,* Senate Bill 3094 (1st Ex.Sess. 1974). By way of contrast, the approach suggested herein would reach only those portions of the arrest records, *i.e.*, names and addresses, protected by the constitutionally guaranteed right of privacy. It would allow retention of other portions of the records of criminal arrest. *See* footnote 7, *supra*.

For the foregoing reasons, I believe a different result than reached by the majority is dictated by the constitutional right of privacy.[10] I, therefore, dissent to the majori-

---

[10]The majority opinion misconceives the thrust of the result which is urged here. I have not suggested disturbing, in any manner, the background data maintained by juvenile authorities, nor do I argue for the total expunction of police records.

Moreover, a fundamental disagreement separates the majority's reasoning and this dissent. The opinion of the majority asserts that a record of arrest may be of assistance to the sentencing judge. In view of the parens patriae nature of the juvenile court, this assertion on its face has a certain beguiling appeal. Closer examination, however, suggests that it is fraught with constitutional difficulties.

The juvenile must be accorded, at a minimum, the full panoply of due process guaranties accorded to adults. *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967). It is now well established that a conviction obtained in violation of constitutional guaranties may *not* be considered in the sentencing process. *United States v. Tucker*, 404 U.S. 443, 30 L. Ed. 2d 592, 92 S. Ct. 589 (1972); *Haislip v. Morris*, 84 Wn.2d

ty's allowance of unrestricted use of arrest records by law enforcement agencies. I would set aside the Juvenile Court's ruling on the motion to expunge and remand this cause for further proceedings and consideration by the Juvenile Court consistent with the views expressed in this dissent.

ROSELLINI and UTTER, JJ., concur with FINLEY, J.

---

106, 524 P.2d 405 (1974). The United States Supreme Court has stated and restated that the fact of arrest is probative of nothing. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 1 L. Ed. 2d 796, 77 S. Ct. 752 (1957). It seems a constitutional paradox that if a juvenile pleads guilty to an offense without the benefit of counsel, a later juvenile court would be precluded from considering the prior conviction in its sentencing decision. Whereas, according to the majority, when an arrest is involved, the probation officer may produce a string of prior arrests on "suspicion" and request the juvenile judge to enhance the terms of commitment or other disposition made solely on this basis. This, in my opinion, would unconstitutionally violate both the presumption of innocence and the doctrine of *Tucker*.

Although I do not believe that the result proposed in this opinion will significantly impinge upon the ability of the probation officers to gain pertinent biographical data, I do believe the weighing of a juvenile's "rap sheet" in the sentencing process to be unconstitutional. Therefore, any de minimis constriction in the availability of arrest data would not hamstring the legitimate interests of the juvenile authorities.